# STATE OF CONNECTICUT *v.* ACKEEM RILEY
## (AC 33506)

Beach, Alvord and Borden, Js.

1

Argued January 12, 2012—officially released January 1, 2013

*Heather M. Wood,* assistant public defender, for the appellant (defendant).

*Melissa Patterson,* assistant state's attorney, with whom, on the brief, were *Gail P. Hardy,* state's attorney, *John F. Fahey,* senior assistant state's attorney, and *Kathryn Ward Bare,* assistant state's attorney, for the appellee (state).

BEACH, J. "Determining the appropriate sentence for a teenager convicted of murder presents grave and challenging questions of morality and social policy." *Miller* v. *Alabama,*      U.S.      , 132 S. Ct. 2455, 2477, 183 L. Ed. 2d 407 (2012) (Roberts, C. J., dissenting). Last term, in *Miller,* the United States Supreme Court held that, in addressing this complicated issue, policymakers can no longer prescribe mandatory life without parole sentences for juveniles,[1] even for the most serious homicide offenses. Id., 2460.

The defendant, Ackeem Riley, who was seven months shy of his eighteenth birthday at the time of his crimes, challenges the sentence imposed by the trial court following his conviction of one count of murder in violation of General Statutes §§ 53a-54a (a) and 53a-8, two counts of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a (a), two counts of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8, and one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a). The defendant was sentenced to 100 years imprisonment.[2] Although

---

[1] Throughout this opinion, we refer to individuals younger than age eighteen as juveniles.

[2] Although the defendant's sentence is a term of years, the parties do not dispute that it is tantamount to life in prison without the possibility of parole. The defendant is not eligible for parole for his murder conviction until he has six months or less remaining on the sixty year sentence. See General Statutes § 54-125g. He will not be eligible for parole on his conviction of the attempted murder charges until he has served 85 percent of his

the sentence imposed was not mandatory, the defendant claims that, in order to comply with the logic underpinning the holding in *Miller*, he is entitled to a resentencing procedure in which the court will be required not only to consider his youth and any attendant deficiencies, but also to articulate on the record that it has done so. The defendant further claims that, if the court were again to impose a life without parole sentence, it must explain why such a severe sentence was appropriate despite his age. We decline to adopt such a rigid interpretation of the rule announced in *Miller*. Because the court exercised discretion in fashioning the defendant's sentence, and was free to consider any mitigating evidence the defendant was able to marshal, including evidence pertaining to his age and maturity, we affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the disposition of this appeal. At approximately 6 p.m. on November 17, 2006, the defendant and his companion, Lasell Lewis, were driving a borrowed car in Hartford's North End. As they drove by a house on Garden Street, they thought they saw a male named Mike, who they

consecutive sentences for those offenses. See General Statutes § 54-125a (b) (2) (individual convicted of offense "where the underlying facts and circumstances . . . involve the use, attempted use or threatened use of physical force against another person shall be ineligible for parole . . . until such person has served not less than eighty-five per cent of the definite sentence imposed").

At least one court has held that § 54-125a (b) (1) precludes individuals convicted of certain enumerated homicide offenses from being eligible for parole on any other related sentence, that is, even after the discharge of the homicide sentence. See *Stevens* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-03-0004193 (May 24, 2006) (41 Conn. L. Rptr. 415). Under this construction of the parole statute, the defendant would be ineligible for parole for all the offenses of which he was convicted. For purposes of this case, we need not resolve which interpretation of the statute is correct; it is sufficient to conclude that he was sentenced to serve between ninety-four and 100 years in prison.

believed was responsible for a gang related shooting on Vine Street the previous week. The defendant and Lewis circled back with the intention of exacting revenge and drove by the house again, this time firing a barrage of bullets into a crowd of people and hitting three young men.

Tray Davis, a sixteen year old, died of gunshot wounds to his head and chest. Twenty-one year old Montrel Gage and thirteen year old Jaequan Sheppard-Ray were seriously injured but survived. Gage was shot in the back; the bullet was never extracted from his body. Sheppard-Ray was shot in the abdomen and sustained multiple life-threatening injuries. There was no suggestion that any of the three victims was involved in gang activity.

The defendant was charged with six counts: one count of murder for the shooting of Davis; two counts each of attempted murder and first degree assault for the shootings of Gage and Sheppard-Ray; and one count of conspiracy to commit murder. Pursuant to General Statutes § 46b-127 (a), the defendant's case was automatically transferred from the juvenile docket to the regular criminal docket of the Superior Court. On March 3, 2009, after a five day trial, the jury returned a verdict of guilty on all charges.

On May 5, 2009, the defendant appeared for sentencing. The court heard statements from the prosecutor, defense counsel and the mothers of two of the three victims, Gage and Davis. The court had also reviewed the defendant's presentence investigation report, which included, among other things, information about the defendant's family, upbringing, education and physical and mental health.[3]

---

[3] Under General Statutes § 54-91a, a sentencing court is required to consider the information contained in the presentence investigation report. See also State v. Tarasco, 301 Conn. 103, 107, 22 A.3d 530 (2011) ("it is axiomatic that the trial court must consider during sentencing the information contained in a presentence investigation report").

The state asked the court to impose an effective sentence of 120 years imprisonment because, in its view, the defendant "should never ever be on the streets again." Any chance for rehabilitation, the state argued, was significantly undermined by the defendant's alleged involvement in another shooting that took place several weeks after the Garden Street incident and which resulted in the paralysis of one of the two victims. There were, then, at least five victims shot by the defendant and his colleagues in these two transactions.

Defense counsel addressed the court next. He explained that the defendant would not be speaking on his own behalf because he maintained his innocence and therefore could not be expected to express remorse or sympathy. Moreover, defense counsel told the court that his client had instructed him to keep his remarks "short and sweet . . . ." Regarding the defendant's background, defense counsel pointed out that the defendant was "a young man"; that he had experienced a "fallout" with his father and subsequently "[taken] to the streets"; and that he had had difficulties in school. He also suggested that the defendant should be presumed innocent of the subsequent shooting, which the prosecutor had described. He concluded his remarks by asking the court "to consider [the defendant's] age" and that he had "little or no prior involvement in the criminal justice system" and to "use [its] wisdom in meting out a punishment that you feel is appropriate."

In rendering its sentence, the court asserted that it was unable to identify anything in the defendant's background that might have explained why his life had taken such a violent turn. The court conceded that it had "very little sense of [the defendant]" because he had not testified at trial or spoken at his sentencing, but it observed that the defendant's life had been "pretty unremarkable. There's no reason or excuse for him being here. He didn't really come from a horrible family,

wasn't abused as a child . . . wasn't raised by someone smoking crack or drinking all day. Had a loving mother . . . [and] a relationship with his father." The court also acknowledged the senselessness of the crimes of which the defendant had been convicted and the terror inflicted on Hartford neighborhoods by random shootings. The court finally considered the likelihood that the defendant would be rehabilitated and concluded that "[t]he answer is probably never." The court expressed its sympathy for the victims and their families, and then, exercising its sentencing discretion, imposed a total effective sentence of 100 years imprisonment.

The defendant was sentenced to sixty years for count one for the murder of Davis; twenty years for count two for the attempted murder of Gage, consecutive to the first count; twenty years for count three for the attempted murder of Sheppard-Ray, consecutive to the first two counts; twenty years for count four for the assault of Gage with a firearm, concurrent to the second count; twenty years for count five for the assault of Sheppard-Ray with a firearm, concurrent to the third count; and twenty years for count six for conspiracy to commit murder, concurrent to the previous counts. This appeal followed.

This case was argued before this court on January 12, 2012. At that time, the defendant claimed that *Roper* v. *Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), and *Graham* v. *Florida*, 560 U.S. 48, 74, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), entitled him to a resentencing procedure in which the trial court would expressly consider his youthful characteristics and reduced culpability. The state countered that *Graham* was not controlling because it created only a categorical ban on the imposition of life sentences without the possibility of parole for *nonhomicide* offenses, and

did not require sentencing courts to consider the defendant's age and development in all cases. Additionally, the state asserted that *State* v. *Allen*, 289 Conn. 550, 581–86, 958 A.2d 1214 (2008),[4] had already settled the issue of whether life without the possibility of release is a constitutionally permissible sentence for juveniles convicted of murder, and that *Graham* did not disturb that holding.

While this case was pending, the United States Supreme Court granted certiorari in *Miller* v. *State*, 63 So. 3d 676 (Ala. Crim. App.), cert. denied, No. 1091663 (Ala. October 22, 2010); see *Miller* v. *Alabama*, 565 U.S. 1013, 132 S. Ct. 548, 181 L. Ed. 2d 395 (2011) (grant of certiorari); and a companion case, *Jackson* v. *Norris*, 378 S.W.3d 103 (Ark. 2011). See *Jackson* v. *Hobbs*, 565 U.S. 1013, 132 S. Ct. 548, 181 L. Ed. 2d 395 (2011) (grant of certiorari).[5] Both cases involved fourteen year old defendants who were sentenced, following aggravated murder convictions, to life imprisonment without the possibility of parole under mandatory sentencing schemes. *Miller* v. *Alabama*, supra, 132 S. Ct. 2460. In other words, once the petitioners were convicted of their respective crimes, the sentencing authority had no discretion to impose a sentence other than life without the possibility of parole.

The petitioners in *Miller* and *Jackson* argued first that the imposition of a life without parole sentence on a fourteen year old was unconstitutional under eighth

---

[4] The juvenile defendant in *Allen*, unlike the defendant here, was sentenced to life without the possibility of release following his conviction of capital felony. *State* v. *Allen*, supra, 289 Conn. 580. Therefore, his life sentence was mandatory. See General Statutes § 53a-35a (1). This application of Connecticut's sentencing scheme, which imposes mandatory life without parole sentences on juveniles convicted of capital felony, has been rendered unconstitutional by *Miller*.

[5] These two cases were later consolidated. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2463.

amendment excessiveness principles. See *Miller* v. *Alabama*, U.S. Supreme Court Record & Briefs, January Term (2012), Petitioner's Brief p. 10. Specifically, they contended that "nothing in the constitutional analysis established by the *Roper* and *Graham* opinions and nothing in the real-world facts and conditions relevant to that analysis permits a rational distinction between life without parole for children who commit murder and life without parole for children who commit other serious crimes . . . ." *Jackson* v. *Hobbs*, U.S. Supreme Court Record & Briefs, January Term (2012), Petitioner's Brief p. 15. The petitioners additionally asserted that the mandatory nature of their life without parole sentences "provide[d] an independently sufficient ground for [their] invalidation." *Miller* v. *Alabama*, supra, Petitioner's Brief p. 8.

On June 25, 2012, *Miller* was decided. We ordered supplemental briefing on *Miller*'s effect, if any, on the present case. As *Miller* squarely addresses the propriety of life without parole sentences for juvenile offenders, we focus our analysis there.

I

The defendant claims that *Miller* renders the manner in which his sentence was imposed unconstitutional.[6] Specifically, he argues that *Miller* requires the sentencing court to hold a hearing at which the juvenile defendant may present mitigating evidence of the youthful deficiencies identified as constitutionally significant by

---

[6] The defendant did not object at the sentencing hearing to the manner in which his sentence was determined. He therefore seeks appellate review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). In order to obtain review under *Golding*, the defendant must provide an adequate record and must assert a claim of constitutional magnitude. See *State* v. *Moore*, 293 Conn. 781, 805, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010). The record here, which includes the sentencing hearing transcript and presentence investigation report, is adequate for review of the defendant's eighth amendment claim.

the United States Supreme Court in its juvenile sentencing cases. Then, the court must articulate on the record which of the factors it considered in rendering a sentence. Finally, if the court nonetheless chooses to impose a life without parole sentence, it must explain why it believed such a severe sentence was warranted despite the evidence presented in mitigation. Such a procedure, the defendant claims, will ensure that life without parole sentences for juveniles will be "uncommon."

We disagree with the defendant for two reasons. First, we read *Miller* to hold that juvenile defendants, in cases where life without parole is a possible penalty, must have the opportunity to present mitigating evidence, but not to define a process that sentencing courts must follow. Second, even though the defendant declined to avail himself fully of the opportunity to present mitigating evidence related to his youth and upbringing, it is clear that the court was cognizant of these issues and searched the presentence investigation report for circumstances that might have militated against imposing a life without parole sentence. Therefore, the defendant's youth was not irrelevant, either statutorily or in practice, to the consideration of his sentence.

### A

This case presents a question of constitutional law over which we exercise plenary review. See *State* v. *Marsala*, 93 Conn. App. 582, 587, 889 A.2d 943, cert. denied, 278 Conn. 902, 896 A.2d 105 (2006). In a trilogy of recent eighth amendment decisions; see *Miller* v. *Alabama*, supra, 132 S. Ct. 2455; *Graham* v. *Florida*, supra, 560 U.S. 48; *Roper* v. *Simmons*, supra, 543 U.S. 551; the United States Supreme Court has significantly altered the landscape of juvenile sentencing practices.[7]

---

[7] The eighth amendment; U.S. Const., amend. VIII; is applicable to the states under the due process clause of the fourteenth amendment. See *Robinson* v. *California*, 370 U.S. 660, 666–67, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962).

In establishing that "children are constitutionally different from adults for purposes of sentencing," these decisions "[rest] not only on common sense—on what any parent knows—but on science and social science as well." (Internal quotation marks omitted.) *Miller* v. *Alabama*, supra, 2464.

The court has identified "three significant gaps between juveniles and adults" that reduce juveniles' moral culpability and increase their potential for reform. Id. First, juveniles have an "underdeveloped sense of responsibility" that can result in "recklessness, impulsivity, and heedless risk-taking." (Internal quotation marks omitted.) Id. Second, juveniles are more susceptible to peer pressure and negative influences. Id. This vulnerability is exacerbated by the fact that juveniles are generally unable to exert control over their environment and "lack the ability to extricate themselves from horrific, crime-producing settings." Id. Finally, a juvenile's character and attitudes are still developing; thus, "his actions [are] less likely to be evidence of irretrievabl[e] deprav[ity]." (Internal quotation marks omitted.) Id. As the court succinctly observed in *Graham*, "incorrigibility is inconsistent with youth." (Internal quotation marks omitted.) *Graham* v. *Florida*, supra, 560 U.S. 73.

These deficiencies, the court further explained, undermine the traditional penological justifications for imposing "the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller* v. *Alabama*, supra, 132 S. Ct. 2465. "Because [t]he heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult." (Internal quotation marks omitted.) Id. Deterrence is also a less compelling justification for the imposition of severe penalties on juveniles because their heightened proclivity for risky

behavior makes them less likely to foresee potential punishment and to alter their conduct accordingly. Id. Finally, incapacitation, particularly in the context of life sentences, requires a judgment that a juvenile "forever will be a danger to society"—a conclusion that is possibly premature given a minor's likelihood to develop and mature. (Internal quotation marks omitted.) Id.

In light of these principles, the court invalidated the death penalty for all juvenile offenders in *Roper* v. *Simmons*, supra, 543 U.S. 568. Next, in *Graham* v. *Florida*, supra, 560 U.S. 74–75, the court categorically barred life without parole sentences for juveniles convicted of nonhomicide offenses. Neither of these cases, however, seemed to suggest that life without parole sentences were constitutionally impermissible for juvenile homicide offenders. See id., 69 ("[t]here is a line between homicide and other serious violent offenses against the individual" [internal quotation marks omitted]); *Roper* v. *Simmons*, supra, 572 (noting that, to extent that prospect of death penalty deters juvenile offenders, life without possibility of parole is "a severe sanction, in particular for a young person"); see also *State* v. *Allen*, supra, 289 Conn. 581 ("[t]he scope of *Roper* . . . is narrow: it applies only where an individual under eighteen years of age is sentenced to death").

Notwithstanding this implicit sanction of life without parole for juveniles convicted of homicide offenses, in *Miller*, the court demarcated some limitations on the imposition of this sentence. The court did not categorically bar this penalty for juveniles; instead, it "mandate[d] only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing [a sentence of life without parole]." *Miller* v. *Alabama*, supra, 132 S. Ct. 2471; contra *Graham* v. *Florida*, supra, 560 U.S. 78 (categorically barring life without possibility of parole for

juveniles convicted of nonhomicide offenses because "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive [such a sentence] . . . despite insufficient culpability" [internal quotation marks omitted]).

The problem with mandatory penalties, the court explained, is that the sentencer is precluded "from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one." *Miller* v. *Alabama*, supra, 132 S. Ct. 2467–68. In determining an appropriate sentence, the court must be permitted to consider potentially mitigating factors such as the defendant's age and "its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; the characteristics of his home environment, from which "he cannot usually extricate himself—no matter how brutal or dysfunctional"; the circumstances of the offense, including the extent of his participation and whether peer pressure may have induced his involvement; and his difficulties in negotiating the criminal justice system, including the diminished ability to assist his attorneys in presenting a defense. Id., 2468. Failure to consider these potentially mitigating circumstances— an inherent failure of mandatory schemes—presents a risk that punishment will be disproportionate to the young defendant's degree of culpability. Id., 2469.

The court in *Miller* identified another difficulty with life without parole sentences for juveniles: these sentences "share some characteristics with death sentences that are shared by no other sentences. . . . Imprisoning an offender until he dies alters the remainder of

his life by a forfeiture that is irrevocable." (Citation omitted; internal quotation marks omitted.) Id., 2466. Moreover, for a juvenile, this is an especially harsh penalty "because he will almost inevitably serve more years and a greater percentage of his life in prison than an adult offender." (Internal quotation marks omitted.) Id. The equation of these two sentences implicated another line of Supreme Court precedents, which require individualized sentencing before imposing the death penalty—a procedure meant to ensure "that the death penalty is reserved only for the most culpable defendants committing the most serious offenses." Id., 2467. "[T]he confluence of these two lines of precedent" provided additional support for "the conclusion that mandatory life-without-parole sentences for juveniles violate the [e]ighth [a]mendment." Id., 2464.

The majority in *Miller* finally suggested that individualized sentencing practices which account for the defendant's "youth (and all that accompanies it)" would likely make the imposition of life without parole sentences on juvenile offenders an "uncommon" occurrence. Id., 2469. Just how uncommon was not clear, and the dissent criticized the majority for making this statement, "although doing so [was] entirely unnecessary to the rule it announce[d] . . . ." Id., 2481 (Roberts, C. J., dissenting). Perhaps, as Chief Justice Roberts suggested, this "gratuitous prediction" was "an invitation to overturn life without parole sentences imposed by juries and trial judges." Id. If it was, we decline that invitation in this case.

To summarize our view of the holding in *Miller*, it is clear that the majority in *Miller* was principally concerned with "sentencing *scheme*[s] that [mandate] life in prison without possibility of parole for juvenile offenders"—these statutory schemes were deemed contrary to the eighth amendment. (Emphasis added.) Id.,

2469. It is equally apparent that life without parole sentences still can be imposed pursuant to an individualized sentencing process, where the sentencing "judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." Id., 2475;[8] see also id., 2469. There may be some ambiguity as to whether such sentencing procedures must simply afford juvenile defendants the opportunity to present mitigating evidence, or whether sentencing authorities are "require[d] . . . to take into account how children are different, and how those differences counsel against irrevocably sentencing them

---

[8] The dissent states that we have failed to recognize "four significant points" from *Miller*. In fact, we address each of the four points. See part I A of this opinion. Nor do we fail to appreciate that the reasoning underpinning *Roper* and *Graham* also applies to the sentencing of juvenile homicide offenders. We do disagree in the application. As we explain, the court in *Miller* said that the constitutionally significant characteristics of juvenile defendants militate against the mandatory sentencing schemes in effect in Arkansas and Alabama. We cannot find in *Miller* the mandate that all juveniles convicted of homicide, and sentenced to life without the possibility of parole under a discretionary regime—a sentence that is certainly not per se unconstitutional—are entitled to a so-called "second look," as indicated by the dissent. The dissent characterizes our failure to find this "second look" requirement in *Miller* to be a "gross misreading" of the opinion. At the same time, it acknowledges that "*Miller*'s narrow holding involves *only a mandatory sentence* of life without the possibility of parole imposed on a juvenile for a homicide offense . . . ." (Emphasis added.) It is hard to reconcile the assertion that our interpretation of *Miller* constitutes a "gross," or even a "cramped," misreading when it is consistent with what the dissent opines is *Miller*'s narrow holding. A narrow or cautious reading, where our state's Supreme Court has previously placed an imprimatur on, and the General Assembly has clearly authorized, the sort of sentence imposed in this case, does not in conscience constitute a "gross misreading . . . ."

We do not necessarily disagree, as reforms worth considering, with the procedures urged by the dissent. We note, however, that the state's duly constituted sentencing commission is reportedly in the process of proposing reforms to the General Assembly; see Conn. Sentencing Commission, Juvenile Sentence Reconsideration Proposal, available at http://www.ct.gov/opm/lib/opm/20121108_juvenile_sentence_reconsideration_proposal.pdf (last visited December 19, 2012); these legislative reforms may alter the parole proceedings as applied to juvenile offenders. It is more appropriate to allow the legislative process to work than to engage in an expansive and unnecessary interpretation of *Miller*.

to a lifetime in prison." Id., 2469. We believe that *Miller*, which invalidated two sentencing schemes in which the sentencing courts had no discretion, and in which the defendants were unable to present any evidence in mitigation, requires only the opportunity to present such evidence to a court permitted to consider it, and to impose a lesser sentence in its discretion.[9]

## B

The sentencing procedure at issue here differed in critical respects from those the Supreme Court found problematic in *Miller*. Unlike the Supreme Court's action in *Jackson* and *Miller*, in which the court invalidated, respectively, certain Arkansas and Alabama statutes, the court in this case was not obligated to sentence the defendant to life without the possibility of release. Indeed, our sentencing statutes permit the court a great deal of discretion in determining an appropriate sentence.

On his murder conviction, a class A felony; see General Statutes § 53a-54a (c); the defendant was exposed to between twenty-five and sixty years incarceration. See General Statutes §§ 53a-35a (2) and 53a-35b. The other offenses of which the defendant was convicted are class B felonies, which carry terms of imprisonment between one and twenty years. See General Statutes §§ 53a-51 (attempt to commit murder is class B felony) and 53a-35a (6) (class B felonies, other than manslaughter in first degree with firearm, carry terms of incarceration between one and twenty years); General Statutes § 53a-59 (b) (assault in first degree by means of firearm

_____

[9] This interpretation of *Miller* is consistent with the United States Supreme Court's individualized sentencing cases in the capital punishment context. See, e.g., *Sumner* v. *Shuman*, 483 U.S. 66, 76, 107 S. Ct. 2716, 97 L. Ed. 2d 56 (1987) (summarizing court's individualized sentencing cases and noting that eighth amendment requires "capital-sentencing schemes [that] permit the defendant to present any relevant mitigating evidence" and that the "sentencing authority be permitted to consider" such evidence).

is class B felony); General Statutes § 53a-51 (conspiracy to commit class A felony is class B felony).

"A sentencing judge has very broad discretion in imposing any sentence within the[se] statutory limits . . . ." (Internal quotation marks omitted.) *State* v. *Bletsch*, 281 Conn. 5, 20, 912 A.2d 992 (2007). In determining an appropriate sentence, "the trial court may consider responsible unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstance." (Internal quotation marks omitted.) Id. The presentence investigation report, which the trial court is required to review; *State* v. *Tarasco*, 301 Conn. 103, 107, 22 A.3d 530 (2011); informs the sentencing process and "play[s] a significant role in reaching a fair [result]." *State* v. *Thomas*, 296 Conn. 375, 389, 995 A.2d 65 (2010). It serves this function by inquiring into a wide range of issues, including "the circumstances of the offense, the attitude of the complainant or victim, or of the immediate family where possible in cases of homicide, and the criminal record, social history and present condition of the defendant. . . ." General Statutes § 54-91a (c). Thus, the presentence investigation report compiles for the court an array of information, which is potentially mitigating or critical in nature.

Moreover, our rules of practice permit a defendant to supplement or challenge the information contained in the presentence investigation report at the sentencing hearing. See Practice Book § 43-10. The sentencing court is instructed to "afford the parties an opportunity to be heard and, in its discretion, to present evidence on any matter relevant to the disposition, and to explain or controvert the presentence investigation report . . . or any other document relied upon by the judicial authority in imposing sentence. . . ." Practice Book § 43-10 (1). The defendant is also afforded "a reasonable opportunity to make a personal statement in his or

her own behalf *and to present any information in mitigation of the sentence.*" (Emphasis added.) Practice Book § 43-10 (3).

The defendant is thus sentenced by a court that is empowered to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider or the source from which it may come." (Internal quotation marks omitted.) *State* v. *Anderson*, 212 Conn. 31, 47, 561 A.2d 897 (1989). This inquiry is certainly expansive enough to encompass information regarding the defendant's age, maturity, upbringing, mental health, and development. Indeed, the sentencing court's mandatory review of the presentence investigation report ensures that many of these issues will be considered. We cannot say that our sentencing scheme is contrary to the holding in *Miller* or the concerns that informed it.

The defendant requests us to impose a sentencing practice for juveniles that would require express, on-the-record consideration of the defendant's age—but sentencing, of course, is not a science.[10] Nor is the process easily reduced to a script or a discrete set of considerations that will ensure a just result in all cases. "Our system depends upon sentencing judges applying their reasoned judgment to each case that comes before them." *Graham* v. *Florida*, supra, 560 U.S. 96 (Roberts, C. J., concurring in the judgment). And, as Chief Justice Roberts observed, "courts traditionally have made [sentencing] judgments by applying generally accepted criteria to analyze the harm caused or threatened to the victim or society, and the culpability of the offender." (Internal quotation marks omitted.) Id. One of the "generally accepted" factors that courts consider in

---

[10] See generally D. Chin, "Sentencing: A Role for Empathy," 160 U. Pa. L. Rev. 1561, 1580 (2012) ("[t]here is no 'right' answer as to what a particular sentence should be; rather, there usually is a range of acceptable sentences, and often that range is quite wide").

assessing the culpability of the defendant is age. *Roper* suggested as much when it observed that "any parent knows" that "lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young." (Internal quotation marks omitted.) *Roper* v. *Simmons*, supra, 543 U.S. 569. We believe that our current sentencing procedures afford juvenile defendants sufficient opportunity, and courts ample discretion, for meaningful mitigation of juvenile sentences. This individualized sentencing process therefore comports with the eighth amendment.

## C

Our belief that current sentencing practices adequately account for the age, maturity, and upbringing of juvenile defendants is bolstered by the record in this case. Even without a procedure that mandated specific consideration of juvenile deficiencies, the court nonetheless addressed many of the potentially mitigating issues identified in *Miller*. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2467–69. The court explicitly discussed the defendant's family and upbringing, noting that he had a "loving mother" and "a relationship with his father . . . ." The court also observed that there was no indication that the defendant had grown up in an environment of drug or alcohol abuse. In an allusion to the defendant's young age, which had been mentioned by his attorney, the court suggested that the defendant "had all the opportunities that everybody else has in this world . . . ." The court ultimately concluded that "[t]here's no reason or excuse for him being here,"[11]

[11] In this regard, a comparison with the fourteen year old petitioners in *Miller* is instructive. The majority noted that Kuntrell Jackson had been "immers[ed] in violence," and that his mother and grandmother had previously shot other individuals. *Miller* v. *Alabama*, supra, 132 S. Ct. 2468. Evan Miller had been physically abused by his stepfather; neglected by his mother, who was addicted to drugs and alcohol, and consequently put into foster care; and had attempted suicide four times in his young life. Id., 2469.

suggesting that it was looking for circumstances that might have provided grounds for leniency.

In contrast to the information available about the defendant, which the court characterized as "pretty unremarkable," were his crimes, which the court described as senseless and contributing to an atmosphere of terror in Hartford. The court additionally lamented the fact that the three victims were "innocent, blameless young guys minding their own business . . . ." As to the possibility of the defendant's rehabilitation, the court found it improbable. In making this determination, the court may have considered the subsequent shooting incident for which the defendant was charged, which consideration would not have been improper.[12] See State v. Bletsch, supra, 281 Conn. 20 (sentencing judge may consider "evidence of crimes for which the defendant was indicted but neither tried nor convicted" [internal quotation marks omitted]).

Faced with these competing concerns—the defendant's youth, the nature of his crime, his alleged involvement in another serious shooting incident—the court imposed a term of years, which functionally was a sentence of life without the possibility of release. It is clear from the record that the defendant's youth was not "irrelevant"; Miller v. Alabama, supra, 132 S. Ct. 2469; to the analysis, but in this case it did not trump other legitimate sentencing concerns. After all, "[t]hose under 18 years old may as a general matter have 'diminished' culpability relative to adults who commit the same crimes . . . but that does not mean that their culpability is always insufficient to justify a life sentence." (Citation omitted.) Graham v. Florida, supra, 560 U.S. 95 (Roberts, C. J., concurring in the judgment). Thus, even under an expansive interpretation of Miller's holding—

---

[12] There is nothing in the record to suggest one way or the other whether the court considered the subsequent criminal charges.

one which requires not only an opportunity for the defendant to present mitigating evidence, but also imposes on the sentencing court a duty to inquire into issues related to the defendant's age and to consider such issues in sentencing—the record in this case passes constitutional muster.

## II

The facts of this case are tragic, "most of all for the innocent victims. But also for the murderer, whose life has gone so wrong so early. And for society as well, which has lost one . . . of its members to deliberate violence, and must harshly punish another." *Miller* v. *Alabama*, supra, 132 S. Ct. 2482 (Roberts, C. J., dissenting). In these difficult cases, the federal constitution requires that the young defendant be sentenced as an individual, where the court can, and should, weigh his maturity, development, and likelihood for rehabilitation against the harm he has caused to his victims and society. The defendant here received what the constitution guarantees.

The judgment is affirmed.

In this opinion ALVORD, J., concurred.

BORDEN, J., dissenting. On May 17, 2010, the United States Supreme Court decided the case of *Graham* v. *Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), holding that it is cruel and unusual punishment[1] to sentence a person who committed a nonhomicide offense, when he was younger than age eighteen[2] at

---

[1] The eighth amendment prohibition on cruel and unusual punishment is applicable to the states through the due process clause of the fourteenth amendment. See *Tuilaepa* v. *California*, 512 U.S. 967, 970, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994).

[2] In accord with the Supreme Court's decision in *Graham* v. *Florida*, supra, 560 U.S. 48, throughout this opinion I refer to persons younger than age eighteen when they committed their crimes as juveniles.

the time of the crime, to a life sentence without the possibility of parole. Id., 74–75. The court also held that, in such circumstances, the state must afford the person so sentenced a meaningful opportunity to be heard in the future[3] to establish that his sentence be modified or that he be released because he had matured and had overcome the mental, psychological and environmental deficits that the court identified as attendant to juveniles. Id. I refer herein to these future proceedings as the *Graham* "second look" requirement. These holdings were based on a body of science regarding the juvenile brain[4] that the court considered as reliable and authoritative. Id., 67–69.

On June 25, 2012, the Supreme Court decided the case of *Miller* v. *Alabama*, U.S. , 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). As I read *Miller*, in contrast to the cramped reading by the majority, the Supreme Court, based on the science and reasoning of *Graham*, expanded the reach of *Graham* to life sentences without the possibility of parole for homicide cases as well, and also concluded that a life sentence without the possibility of parole for a juvenile convicted of a homicide offense was cruel and unusual punishment. Id., 2469. In contrast, however, to the "second look" remedy in *Graham*, namely, a hearing at some time in the future, the remedy imposed by the court in *Miller* was an actual resentencing now, at which the sentencing court is required to take into account the differences, identified by that body of science, between the juvenile and adult brains. *Miller* v. *Alabama*, supra, 2475.

---

[3] The court did not specify either the forum in which or the time period when this opportunity must be afforded.

[4] I use the term "juvenile brain" as shorthand for the various mental, psychological and environmental deficits of juveniles that the Supreme Court identified, first in *Roper* v. *Simmons*, 543 U.S. 551, 569–70, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (unconstitutional to impose death penalty on juvenile), and later reiterated in *Graham* v. *Florida*, supra, 560 U.S. 48, and *Miller* v. *Alabama*, U.S. , 132 S. Ct. 2455, 2464–65, 183 L. Ed. 2d 407 (2012).

In the present case, the defendant, Ackeem Riley, was born on June 18, 1989. On November 17, 2006, when he was a seventeen year old juvenile, he committed the crimes of murder, attempted murder, assault in the first degree and conspiracy to commit murder. On May 5, 2009, when he was not quite twenty years old, he received for those crimes an effective sentence of 100 years of incarceration without the possibility of parole, guaranteeing that he will die in prison. Moreover, he will die in prison without the sentencing court having taken into account the available science regarding the juvenile brain, and without any future review, based on that science, of the possibility of his having matured and rehabilitated himself. As I will explain, that sentence constitutes cruel and unusual punishment, as explicated in *Miller*.

The majority concludes to the contrary, holding that the sentence is valid under *Miller* and, accordingly, must stand. In my view, the majority's reading of *Miller* is a misreading. It ignores the reasoning of *Miller* related to the science regarding the juvenile brain on which it, and its progenitor, *Graham*, are based. It ignores the instruction of *Miller* that, in imposing such a sentence on a juvenile, the court must take into account the qualitative differences between the juvenile and adult brains that the science tells us exist. Id., 2469. Finally, the majority ignores the reasoning of *Miller* that mandates, based on *Graham*, that every juvenile given a life sentence without the possibility of parole must at some time in the future be afforded a "second look," namely, a meaningful opportunity to be heard to establish that his sentence be modified or that he be released because he had matured and had overcome the mental, psychological and environmental deficits that the court identified as attendant to the juvenile brain. *Graham* v. *Florida*, supra, 560 U.S. 74–75. I therefore dissent.

I conclude, instead, that the defendant's sentence constitutes cruel and unusual punishment under the eighth and fourteenth amendments. I conclude further that he must now be resentenced in accord with *Miller*, and that the sentence must include a provision that, at some time in the future, he be given the "second look" opportunity that *Miller* and *Graham* require.

## I

## THE SENTENCING IN THE PRESENT CASE

As the majority accurately represents, the sentencing proceeding in this case followed a pattern that, prior to *Miller*, would have been relatively unremarkable for a case of this seriousness. And that is precisely because it took place prior to both *Miller* and *Graham*. In sum, the trial court read the presentence investigation report, heard argument from the state, heard from the mother of the victim who had died and the mother of one of the other victims, heard from the defendant's counsel, but not from the defendant, who chose not to address the court, and put its reasons for its sentence on the record.

The state asked for a sentence of 120 years so that the defendant would never again be free because, in its view, he was beyond the pale of possible rehabilitation. The state based this request on the facts of the case—namely, that the defendant had participated in a drive-by shooting that resulted in the death of one innocent victim and grievous injuries to two other innocent victims—and on the fact that, some weeks after this incident, the defendant was involved in the shooting of two victims, paralyzing one of them. The presentence investigation report includes information about the defendant's family, upbringing, physical and mental health and education. The defendant's counsel referred to some of the material in the presentence investigation

report, characterizing it as "[f]airly unremarkable."[5] Regarding the case itself, counsel told the court that, because the defendant maintained his innocence and intended to appeal, "it's rather difficult for an individual who maintains his innocence to . . . express any remorse or sympathy or empathy for something that he claims he did not do." Counsel asked the court to consider the defendant's age and the fact that he had "little or no prior involvement in the criminal justice system . . . in meting out punishment that you feel is appropriate."

The court then placed its reasons for its sentence on the record. It first noted that, as the state had argued, the victims were "innocent, blameless young guys minding their own business, hadn't hurt anyone, weren't involved in any gang activity, didn't use drugs, didn't bother anybody, just teenagers." The court then noted the effect on the victims and their families, and that the defendant, "for whatever reason, which I cannot figure out, other than he lived in a different neighborhood than other people, decided that it would be okay to drive by . . . and shoot many times with a semiautomatic weapon into a large group of teenagers just relaxing in front of a house not bothering anybody. The senselessness of that is mind-boggling."

Next, the court adverted to the strength of the state's case, namely, eyewitness identifications and corroborating evidence. In addition, the court noted "the terror experienced by people who live in Hartford," likened it to living with the worry "about a roadside bomb," and stated that the defendant "should be treated like a terrorist." Turning to the presentence investigation report, the court agreed that it was "pretty unremarkable. There's no reason or excuse for him being here."

---

[5] My examination of the report, contained in the file, supports that description.

The court noted the defendant's relatively stable family, that he "had all the opportunities . . . to do whatever he wanted to do and become whatever he wanted to become. And he chose to become a murderer."

Finally, the court addressed the defendant. The court stated: "I have very little sense of [the defendant] except what was described during the trial. He was well behaved during the trial; never said a word. Did not testify; I don't know what his voice sounds like. So, I have very little sense of the type of person he is except for what he did on this day and [for] that, that's what I have to sentence him for." The court then, exercising its sentencing discretion, imposed the effective sentence of 100 years, which, as the majority accurately states, amounts to a sentence of 100 years without the possibility of parole that ensures that the defendant will die in prison.

## II

## THE MAJORITY OPINION

I briefly turn, next, to the majority opinion. Its gist is as follows: "To summarize our view of the holding in *Miller*, it is clear that the majority in *Miller* was principally concerned with 'sentencing *scheme*[s] that [mandate] life in prison without possibility of parole for juvenile offenders'—these statutory schemes were deemed contrary to the eighth amendment. [(Emphasis in original.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2469]. It is equally apparent that life without parole sentences still can be imposed pursuant to an individualized sentencing process, where the sentencing 'judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.' Id., 2475; see also id., 2469. There may be some ambiguity as to whether such sentencing procedures must simply afford juvenile defendants the opportunity to present mitigating evidence, or whether

sentencing authorities are 'require[d] . . . to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' Id., 2469. We believe that *Miller*, which invalidated two sentencing schemes in which the sentencing courts had no discretion, and in which the defendants were unable to present any evidence in mitigation, requires only the opportunity to present such evidence to a court permitted to consider it, and to impose a lesser sentence in its discretion."

Thus, the majority reads *Miller* as doing no more than invalidating a *mandatory* sentence of life without parole on a juvenile. The majority finds an "ambiguity" regarding whether, under *Miller*, "such sentencing procedures must simply afford juvenile defendants the opportunity to present mitigating evidence, or whether sentencing authorities are 'require[d] to . . . take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " And the majority resolves this— in my view, self-created—ambiguity in favor of simply affording the juvenile defendant the opportunity to present mitigating evidence that the court must consider.

Thus, in the majority's view, so long as the defendant has the opportunity to present and the court is required to consider mitigating evidence, and the court has the discretion to impose a lesser sentence than life without parole—as both the defendant and the court unquestionably did in the present case—the sentence that will doom a juvenile to die in prison is perfectly valid under *Miller* and the eighth amendment. This is a gross misreading of *Miller*. To show why, I begin with *Graham*.

## III

### GRAHAM

In *Graham*, the United States Supreme Court considered whether the eighth amendment permits the sentencing of juveniles convicted of nonhomicide offenses

to life without parole. *Graham* v. *Florida,* supra, 560 U.S. 64–65. Terrance Jamar Graham, who was sixteen at the time, along with three other youths attempted to rob a restaurant but fled after Graham's accomplice assaulted the restaurant manager. Id., 53. Initially, under a plea agreement, Graham received probation for the crimes of armed burglary and attempted armed robbery. Id., 54. One month short of his eighteenth birthday, however, Graham violated the terms of his probation by committing additional crimes. Id. Thereafter, Graham was sentenced to life without the possibility of parole for the armed burglary and fifteen years for the attempted armed robbery. Id., 57.

On appeal to the United States Supreme Court, the court held: "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." Id., 82. In other words, the state must "give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id., 75.

In *Graham,* the court relied heavily on its earlier findings in *Roper* v. *Simmons,* 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005),[6] regarding the lessened

---

[6] In *Roper* v. *Simmons,* supra, 543 U.S. 555–56, the Supreme Court considered "whether it is permissible under the Eighth and Fourteenth Amendments to the Constitution of the United States to execute a juvenile offender who was older than 15 but younger than 18 when he committed a capital crime." The court held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." Id., 578. The court addressed in its analysis the existence of significant scientific and sociological studies that demonstrate juveniles' "lack of maturity and an underdeveloped sense of responsibility"; id., 569; juveniles' vulnerability to outside influences such as peer pressure and juveniles' underdeveloped mental character. Id., 569–70.

culpability of juveniles. Those findings, drawn from significant scientific and sociological studies, showed that juveniles lack maturity, have an underdeveloped sense of responsibility, are particularly vulnerable to outside influences such as peer pressure, and possess an underdeveloped mental character. Id., 569–70. The court in *Graham* reasoned that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Graham* v. *Florida,* supra, 560 U.S. 68. Thus, the court concluded that due to their reduced culpability, juveniles are categorically "less deserving of the most severe punishments." Id.

The court in *Graham* took the same categorical approach to its evaluation of the severity of life without parole as it had done in *Roper* regarding the death penalty. But rather than focusing on the nature of the offense—as it had previously done in eighth amendment challenges where the death penalty was not at issue— the court's analysis centered on the characteristics of the juvenile offender, the same approach that it used in both *Roper* and *Atkins* v. *Virginia,* 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002),[7] to invalidate the death penalty for an entire class of offenders. In evaluating the severity of the sentence, the court recognized that life without parole shares certain characteristics with the death penalty that no other sentences share. Specifically, life without parole "alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration . . . ." *Graham* v. *Florida,* supra, 560 U.S. 69–70. The court also pointed out that this sentence is "especially harsh" for juveniles

---

[7] In *Atkins* v. *Virginia,* supra, 536 U.S. 321, the United States Supreme Court held that it is a violation of the eighth amendment ban on cruel and unusual punishment to execute death row inmates with "mental retardation . . . ."

because, inevitably, a juvenile sentenced to life without parole will spend more time behind bars than his or her adult counterpart will spend. Id., 70.

In examining the penological justifications for a sentence of life without parole, the court concluded that the diminished culpability of juveniles undermines the legitimacy of deterrence, retribution, incapacitation and rehabilitation as justifiable goals for these sentences. Id., 74. Deterrence is premised on the belief that one evaluates the consequences of one's actions, but the court said that because juveniles lack the maturity to consider such consequences, the deterrence effect is rendered impotent. Id., 72. Similarly, in the court's view, retribution is not justified because invoking the "second most severe penalty on the less culpable juvenile nonhomicide offender" is not proportionate. Id. With regard to incapacitation, the court reasoned that "[t]o justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable." Id., 72–73. Thus, the court forbade trial courts from making this sort of determination at the outset of a juvenile's sentence. Id. Finally, the concept of rehabilitation could not be used to justify the sentence because, by its very nature, the sentence repudiates the key principle of rehabilitation. Id., 74. Accordingly, "[b]ecause [t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood," the court held that "those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime." (Internal quotation marks omitted.) Id., 74–75.

The present case was argued on January 12, 2012. At that time, *Graham* was the only governing United States Supreme Court precedent, and our own Supreme Court squarely had held that it was constitutional to impose

a sentence of life without the possibility of release on a juvenile for the commission of a capital felony. *State v. Allen*, 289 Conn. 550, 581–86, 958 A.2d 1214 (2008). In *Allen*, although the court recognized that "persons under the age of eighteen differ from adults in terms of their culpability and moral responsibility"; id., 581; it read *Roper* as implicitly sanctioning a sentence of life without parole as "an acceptable alternative to death as a punishment for juveniles who committed intentional [m]urder in the [f]irst [d]egree . . . ." (Internal quotation marks omitted.) Id., 584. Thus, the legal landscape seemed strongly to suggest the following: *Graham* was limited to nonhomicide offenses—which the present case is not—and *Allen* seemed to sanction the sentence imposed in the present case for murder and attempted murder.

Nonetheless, we were informed that the United States Supreme Court had granted certiorari in *Miller* and a companion case; *Jackson v. Norris*, 378 S.W.3d 103 (Ark.), cert. granted sub nom. *Jackson v. Hobbs*, 565 U.S. 1013, 132 S. Ct. 548, 181 L. Ed. 2d 395 (2011); and among the questions presented was whether the eighth amendment barred the imposition of a sentence of life, without the possibility of release, on a juvenile for a homicide offense. *Miller v. State*, 63 So. 3d 676 (Ala. Crim. App.), cert. denied, No. 1091663 (Ala. October 22, 2010), cert. granted, *Miller v. Alabama*, 565 U.S. 1013, 132 S. Ct. 548, 181 L. Ed. 2d 395 (2011). Moreover, we learned that *Miller* was scheduled for oral argument on March 20, 2012. We therefore stayed the decision in the present case pending the decision in *Miller*, ordering the parties to file supplemental briefs once *Miller* was decided on the question of the effect, if any, of *Miller* on the present case. I now turn to that effect.

IV

*MILLER*

In *Miller v. Alabama*, supra, 132 S. Ct. 2475, the court held that it is cruel and unusual punishment to impose

a *mandatory* sentence of life without the possibility of parole on a juvenile who has committed murder. The two fourteen year old offenders in the consolidated cases of *Miller* v. *Alabama*, supra, 132 S. Ct. 2455, and *Jackson* v. *Hobbs*, U.S. , 132 S. Ct. 548, 181 L. Ed. 2d 395 (2011), were convicted of murder and sentenced to life imprisonment without the possibility of parole. *Miller* v. *Alabama*, supra, 2460. In neither case did the sentencing authority have any discretion to impose a different punishment because the relevant state law mandated that each juvenile die in prison. Id. In *Miller*, Evan Miller, along with a friend, beat a neighbor and set fire to his trailer after an evening of drinking and drug use, causing the neighbor's death. Id., 2462. Miller initially was charged as a juvenile, but his case was removed to adult court, where he was charged with murder in the course of arson. Id., 2462–63. A jury found Miller guilty, and the trial court imposed the statutorily mandated punishment of life without parole. Id. In *Jackson*, Kuntrell Jackson accompanied two other boys to a video store to commit a robbery; on the way to the store, Jackson learned that one of the other boys was carrying a shotgun. Id., 2461. Jackson stayed outside the store for most of the robbery, but after he entered, one of his coconspirators shot and killed the store clerk. Id. The state charged Jackson as an adult with capital felony murder and aggravated robbery, and a jury found him guilty of both crimes. Id. The trial court imposed the statutorily mandated sentence of life imprisonment without the possibility of parole. Id. On appeal, the United States Supreme Court invalidated the sentences of both juveniles, holding that the eighth amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders, even for those convicted of homicide offenses. Id., 2475. Having reached this conclusion, the court found it unnecessary to consider the defendants' broader claim,

which this case does present, which is that the eighth amendment forbids a sentence of life without the possibility of parole on a juvenile under a nonmandatory sentencing scheme.

In my view, *Miller* significantly has altered the legal landscape, in ways that the majority fails to recognize. Although *Miller*'s narrow holding involves only a mandatory sentence of life without the possibility of parole imposed on a juvenile for a homicide offense, its reasoning supports the defendant's claim in the present case. In arriving at its conclusion, the court in *Miller* made four significant points—none of which the majority recognizes—that require its application to this case.

First, the court reiterated the scientific findings about the juvenile brain that served as the underpinning of *Graham*. Specifically, the court stated that *"Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, they are less deserving of the most severe punishments. . . . Those cases relied on three significant gaps between juveniles and adults. First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. . . . Second, children are more vulnerable . . . to negative influences and outside pressures, including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. . . . And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity]. . . .

"Our decisions rested not only on common sense—on what any parent knows—but on science and social

science as well. . . . In *Roper*, we cited studies show-
ing that [o]nly a relatively small proportion of adoles-
cents who engage in illegal activity develop entrenched
patterns of problem behavior. . . . (quoting
Steinberg & Scott, Less Guilty by Reason of Adoles-
cence: Developmental Immaturity, Diminished Respon-
sibility, and the Juvenile Death Penalty, 58 Am.
Psychologist 1009, 1014 [2003]). And in *Graham*, we
noted that developments in psychology and brain sci-
ence continue to show fundamental differences
between juvenile and adult minds—for example, in
parts of the brain involved in behavior control. . . .
We reasoned that those findings—of transient rashness,
proclivity for risk, and inability to assess conse-
quences—both lessened a child's moral culpability and
enhanced the prospect that, as the years go by and
neurological development occurs, his deficiencies will
be reformed. . . .

"*Roper* and *Graham* emphasized that the distinctive
attributes of youth diminish the penological justifica-
tions for imposing the harshest sentences on juvenile
offenders, even when they commit terrible crimes.
Because [t]he heart of the retribution rationale relates
to an offender's blameworthiness, the case for retribu-
tion is not as strong with a minor as with an adult. . . .
Nor can deterrence do the work in this context, because
the same characteristics that render juveniles less cul-
pable than adults—their immaturity, recklessness, and
impetuosity—make them less likely to consider poten-
tial punishment. . . . Similarly, incapacitation could
not support the life-without-parole sentence in *Gra-
ham*: Deciding that a juvenile offender forever will be
a danger to society would require mak[ing] a judgment
that [he] is incorrigible—but incorrigibility is inconsis-
tent with youth. . . . And for the same reason, rehabili-
tation could not justify that sentence. Life without
parole forswears altogether the rehabilitative ideal.

. . . It reflects an irrevocable judgment about [an offender's] value and place in society, at odds with a child's capacity for change." (Citations omitted; internal quotation marks omitted.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2464–65.

Indeed, the court noted that "[t]he evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger. See, e.g., Brief for American Psychological Association et al. as Amici Curiae 3 ('[A]n ever-growing body of research in developmental psychology and neuroscience continues to confirm and strengthen the Court's conclusions'); id., at 4 ('It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance'); Brief for J. Lawrence Aber et al. as Amici Curiae 12–28 (discussing post-*Graham* studies); id., 26–27 ('Numerous studies post-*Graham* indicate that exposure to deviant peers leads to increased deviant behavior and is a consistent predictor of adolescent delinquency' . . .)." (Citation omitted.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2464 n.5.

Second, the court stated that, although *Graham*'s categorical ban related only to nonhomicide offenses, its reasoning based on the science of the juvenile brain applies to homicide offenses as well. "*Graham* concluded from this analysis that life-without-parole sentences, like capital punishment, may violate the Eighth Amendment when imposed on children. To be sure, *Graham*'s flat ban on life without parole applied only to nonhomicide crimes, and the Court took care to distinguish those offenses from murder, based on both moral culpability and consequential harm. . . . *But*

*none of what it said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when (as in both cases here) a botched robbery turns into a killing. So Graham's reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.*" (Citation omitted; emphasis added.) Id., 2465.

Furthermore, the court stated that a juvenile's youth implicates the proportionality principle inherent in the eighth amendment beyond the context of a mandatory sentence. "Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole. In the circumstances there, juvenile status precluded a life-without-parole sentence, even though an adult could receive it for a similar crime. And in other contexts as well, the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate. . . . *An offender's age, we made clear in Graham, is relevant to the Eighth Amendment, and so criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 2465–66.

Third, the court emphasized the similarity between a sentence of life without the possibility of parole on a juvenile offender to the death penalty. "Life-without-parole terms, the Court wrote [in *Graham*], share some characteristics with death sentences that are shared by no other sentences. . . . Imprisoning an offender until he dies alters the remainder of his life by a forfeiture that is irrevocable. . . . And this lengthiest possible incarceration is an especially harsh punishment for a

juvenile, because he will almost inevitably serve more years and a greater percentage of his life in prison than an adult offender. [*Graham* v. *Florida,* supra, 560 U.S. 70].'' (Citations omitted; internal quotation marks omitted.) *Miller* v. *Alabama,* supra, 132 S. Ct. 2466.

Fourth, although the court did not categorically ban a sentence of life without the possibility of parole for a juvenile convicted of murder, it ruled that such a sentence would be permissible only so long as the sentencing court *took into account all the scientifically proven factors regarding the juvenile brain.* Id., 2469. In doing so, the court emphasized that such a sentence necessarily would be an uncommon occurrence, and that the sentencing court would be required to take into account all the factors that make juveniles different from adults and explain how, nonetheless, such a sentence is required. Id. And contrary to the majority's view in the present case, there is no ambiguity about whether the sentencing court must specifically take into account the scientifically proven differences between the juvenile and adult brains, or whether, when it does this, such a sentence would necessarily be uncommon. The United States Supreme Court stated: ''But given all we have said in *Roper, Graham,* and this decision about children's diminished culpability and heightened capacity for change, *we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in Roper and Graham of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. . . . Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing*

*them to a lifetime in prison.*"[8] (Citations omitted; emphasis added; internal quotation marks omitted.) Id. Consequently, the court mandated that, where a trial court does impose a sentence of life without parole for a homicide case—which corresponds to the present case—it must, in imposing such a sentence, take "into account how children are different [from adults], and how those differences counsel against irrevocably sentencing" the juvenile before it to "a lifetime in prison." Id.

Thus, it is clear that *Miller* mandates that the present case must be remanded for resentencing. That is because, contrary to the majority's view that all *Miller* does is to require that the defendant have the opportunity to present and the court to consider mitigating evidence, it does much more.

*Miller* requires that, before a sentencing court imposes a sentence under which the juvenile defendant will die in prison, it must take "into account how children are different [from adults], and how those differences counsel against irrevocably sentencing" the juvenile before it to "a lifetime in prison." Id. This is not

---

[8] I find particularly unavailing the majority's reliance on the *dissent* in *Miller* for its criticism of the statement of the *court* in *Miller* that "appropriate occasions for sentencing juveniles [to life without parole] will be uncommon." *Miller* v. *Alabama*, supra, 132 S. Ct. 2469. We are bound by decisions of the United States Supreme Court, that is, the majority decisions, and not by the dissents therein.

Further, simple common sense informs us that the majority's statement in *Miller* is accurate. If the science tells us, as it does, that juveniles, despite the seriousness of their crimes, have "diminished culpability and heightened capacity for change" as compared to adults, and that it is particularly difficult to identify at that young age that the juvenile will *never* change, then it follows that it will be the uncommon case in which a judge sentencing a juvenile for a homicide will be able with some reasonable degree of confidence to say, nonetheless, that the particular juvenile in front of her lacks both that diminished culpability and heightened capacity for change, that is, that this particular juvenile constitutes the rare case of "irreparable corruption." (Internal quotation marks omitted.) Id.

just taking into account "mitigating evidence . . . ." It requires the court to do two things: (1) take into account—by presentation from the state or the defendant, or both—the factors that distinguish the juvenile brain from the adult brain regarding the juvenile's diminished culpability and heightened capacity for change, and (2) take into account how those factors counsel *against* sentencing the juvenile irrevocably to die in prison.[9] Finally, because *Miller* makes clear that *Graham's* reasoning applies to nonhomicide offenses as well as homicide offenses, the present case qualifies for a *Graham* type remedy, namely, a "second look." The California Supreme Court already has so held. See *People* v. *Caballero*, 55 Cal. 4th 262, 267–68, 282 P.3d 291, 145 Cal. Rptr. 3d 286 (2012) (juvenile sentenced to 110 years for attempted murder entitled to *Graham* type remedy).

I recognize that this imposes a heavy burden on all of the participants, including the trial court, engaged in such a sentencing. But that is how it should be. *Miller* teaches that sentencing a juvenile to die in prison should be a rare occurrence precisely because it will be so difficult for any of the participants—state, defendant or court—to say with a reasonable degree of confidence that this particular juvenile, unlike the vast majority of his age cohort, is so incorrigibly corrupt that he is beyond the possibility of change, no matter when.

It is understandable that, given the state of the law at the time of sentencing, the trial court in the present case did not take into account the now constitutionally relevant factors in imposing its sentence. Nonetheless, those factors do apply, by virtue of *Miller*'s reasoning, to the present case, in which the defendant was sentenced,

---

[9] *Miller* does not address the question of whether, if the trial court does decide to impose a life sentence without parole after taking all constitutionally relevant factors into account, it also must explicitly state on the record why it has decided to reject those factors and, nonetheless, sentence the juvenile to die in prison.

albeit not mandatorily, to an effective term of life without the possibility of release. As *Miller* makes clear, those factors apply to the defendant's mental, psychological and environmental incapacities irrespective of his crimes, and the science behind those factors has only become stronger with time. Moreover, those factors implicate the proportionality principle inherent in eighth amendment jurisprudence beyond the context of a mandatory sentence. In addition, although a trial court is not categorically barred from imposing a sentence of life without parole on a juvenile, if it does so it must, according to *Miller*, take those factors into account.

Therefore, in my view, the judgment should be reversed only as to the sentence imposed and the case remanded for a resentencing. In that resentencing, the trial court may only impose a sentence that would be the functional equivalent of life without parole after explicitly taking into account all the factors that make juveniles different from adults and why those factors counsel against imposing such a sentence. In addition, if it does impose such a sentence, the court must include in its sentence a *Graham* type remedy, namely, that at some time in the future the state must afford the defendant "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham* v. *Florida*, supra, 560 U.S. 75.