******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., with whom ZARELLA, J., joins, dissenting. I disagree with the majority's conclusion that the total effective sentence of 100 years imprisonment imposed by the trial court on the defendant, Ackeem Riley, violates the eighth amendment to the United States constitution.[1] I agree with the Appellate Court's conclusion that, "[b]ecause the court exercised discretion in fashioning the defendant's sentence, and was free to consider any mitigating evidence the defendant was able to marshal, including evidence pertaining to his age and maturity"; *State* v. *Riley*, 140 Conn. App. 1, 4, 58 A.3d 304 (2013); the sentence complied with the decision of the United States Supreme Court in *Miller* v. *Alabama*, U.S. , 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), which held that "the [e]ighth [a]mendment forbids a sentencing *scheme* that *mandates* life in prison without possibility of parole for juvenile offenders." (Emphasis added.) Id., 2469. To be clear, therefore, *Miller* applies only to mandatory sentencing schemes. Accordingly, I respectfully dissent.

I emphasize that the question before this court in the present case is not how broadly *this court* would construe the protections afforded to juvenile offenders pursuant to the eighth amendment, but how broadly the United States Supreme Court has extended that protection. In my view, the majority opinion misinterprets *Miller* and extends it beyond the scope intended by the Supreme Court. As the majority explains, *Miller* was the third in a trilogy of decisions by the United States Supreme Court addressing the problem of how to sentence juvenile offenders, defined as persons under eighteen years of age, who face the most extreme punishments available in our criminal justice system. All three decisions rest on a common analytic foundation. On the basis of three differences that distinguish juveniles from adults, namely: (1) "[a] lack of maturity and an underdeveloped sense of responsibility"; (2) a vulnerability to "negative influences and outside pressures, including peer pressure"; and (3) the possession of a character that "is not as well formed as that of an adult"; *Roper* v. *Simmons*, 543 U.S. 551, 569–70, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); the court determined that the eighth amendment required that juvenile offenders be accorded different treatment in sentencing for the most severe punishments. Specifically, the court held in *Roper* that the eighth amendment barred the execution of juvenile offenders. Id., 573–74. Subsequently, in *Graham* v. *Florida*, 560 U.S. 48, 75, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), the court held that the eighth amendment also prohibited the imposition of a sentence of life without the possibility of parole for juvenile offenders convicted of nonhomicide crimes. Finally, in *Miller*, the court held that when the offense is homicide,

the "[e]ighth [a]mendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller* v. *Alabama*, supra, 132 S. Ct. 2469.

Although all three decisions are grounded on the same basic principle, that, because of their particular characteristics, juvenile offenders are less culpable and have greater prospects for reform than adult offenders, each decision is very narrowly tailored to address the particular sentencing issue presented, and it would be a mistake to conflate the three decisions, or to overstate the breadth of the court's holding in any one or all of the three decisions. For instance, in *Graham*, the court was very careful not to extend its holding barring the imposition of a sentence of life without the possibility of parole to juvenile offenders convicted of homicides, on the basis of the court's express recognition that "[t]here is a line between homicide and other serious violent offenses against the individual." (Internal quotation marks omitted.) *Graham* v. *Florida*, supra, 560 U.S. 69. The court maintained that distinction in *Miller*, when it confined its holding to a prohibition of *mandatory* sentences of life without the possibility of parole for juvenile offenders convicted of homicides, expressly delineating the distinction between its holdings in *Graham* and *Miller*, stating that "*Graham* established one rule (a flat ban) for nonhomicide offenses, while we set out a different one (individualized sentencing) for homicide offenses." *Miller* v. *Alabama*, supra, 132 S. Ct. 2466 n.6. The court further clarified: "we do not foreclose a sentencer's ability to [sentence a juvenile offender to life without the possibility of parole] in homicide cases . . . ." Id., 2469.

The court explained the distinction between its holdings in *Roper* and *Graham* and its holding in *Miller*: "Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." Id., 2471. Properly construed, therefore, *Miller* only requires that the sentencing scheme allow the defendant to present, and the sentencing court to consider, evidence regarding the defendant's youth in order to pass constitutional muster. *Miller* prohibits only the *mandatory* imposition of a sentence of life without the possibility of parole on a juvenile convicted of homicide. Because our sentencing scheme allows a defendant to present, and requires a sentencing court to consider, any mitigating evidence, *Miller* simply does not apply to Connecticut's sentencing scheme, which provides precisely what *Miller* requires, namely, individualized sentencing. See General Statutes § 54-91a; Practice Book § 43-10.

This view finds overwhelming support in the deci-

sions of other state courts, a majority of which hold that *Miller* applies only to the mandatory imposition of a sentence of life without the possibility of parole. See, e.g., *Brown* v. *Hobbs*, Docket No. CV-13-1116, 2014 Ark. 267, *3 (2014) (*Miller* applies only to mandatory life sentences); *Lane* v. *State*, 151 So. 3d 20, 21 (Fla. App. 2014) (affirming juvenile offender's life sentence without possibility of parole for homicide because sentencing court conducted " 'individualized mitigation inquiry' "); *Foster* v. *State*, 294 Ga. 383, 387, 754 S.E.2d 33 (2014) (rejecting *Miller* challenge on basis that sentencing scheme gives court discretion over penalty); *People* v. *Davis*, 6 N.E.3d 709, 722–23 (Ill.) (holding that mandatory imposition of sentence of life without possibility of parole violates *Miller*, but observing in dicta that such sentence would be constitutionally permissible "so long as the sentence is at the trial court's discretion rather than mandatory"), cert. denied,     U.S.   , 135 S. Ct. 710, 190 L. Ed. 2d 439 (2014); *Conley* v. *State*, 972 N.E.2d 864, 879 (Ind. 2012) (Indiana's discretionary sentencing scheme does not violate *Miller*, which dealt "solely with the issue of mandatory sentencing schemes requiring life-without-parole for juveniles"); *State* v. *Link*, 260 Or. App. 211, 216, 317 P.3d 298 (2013) (*Miller* limited to mandatory sentence of life without possibility of parole and does not apply to presumptive life sentence); *Johnson* v. *Commonwealth*, 63 Va. App. 175, 183–84, 755 S.E.2d 468 (2014) (*Miller* limited review to constitutionality of mandatory sentencing schemes; Virginia's discretionary sentencing scheme "clearly outside of the category of cases that the Supreme Court addressed in *Miller*").

Despite the careful language of *Miller* itself and the narrow interpretation that most courts have applied to the decision, the majority reads *Miller* in a sweeping manner, concluding that *Miller* applies to discretionary sentencing schemes, notwithstanding the express language in the opinion restricting the scope of the decision to mandatory schemes. The question is not even a close one. As I have observed, the court's statement of its holding limits its scope to mandatory sentencing schemes. Moreover, as the majority acknowledges, the decision is replete with references to the mandatory imposition of a sentence of life without the possibility of parole. Indeed, the word "mandatory" appears in some form or another in *Miller* more than forty times. The majority can point to no language in *Miller* that expands its scope to discretionary sentencing schemes, and, as I have pointed out, express language in *Miller* states the contrary. "[W]e do *not* foreclose a sentencer's ability to [sentence a juvenile offender to life without the possibility of parole] in homicide cases . . . ." (Emphasis added.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2469.

The majority's overly broad reading of *Miller* does not stop there. In addition to extending the application

of the court's holding to discretionary sentencing schemes, despite the express language of the opinion, the majority reads a presumption into *Miller*—a presumption against the imposition of a sentence of a term of years that the majority labels as the functional equivalent of a sentence of life without the possibility of parole.[2] Clearly, in *Roper*, *Graham* and *Miller*, in light of scientific advances revealing significant and relevant differences in the adolescent brain, the Supreme Court has taken cautiously incremental steps back from the imposition of the most extreme punishments on juvenile offenders. The court *may* subsequently expand on its existing holdings. Our task, however, is to interpret what the court currently has stated the eighth amendment requires. Not once in *Miller* does the court suggest that it has established a presumption against the imposition of a sentence of a term of years that constitutes the "functional equivalent" of a sentence of life without the possibility of parole for juveniles. In concluding that *Miller* establishes this presumption, the majority relies on the court's statement opining that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Miller* v. *Alabama*, supra, 132 S. Ct. 2469. The court's belief that it will be uncommon for a sentencing court to exercise its discretion to impose a sentence of life without the possibility of parole on juveniles is a far cry from the establishment of a presumption against the imposition of that sentence on juveniles, particularly in light of the fact that nothing in *Miller* suggests that courts no longer retain the discretion to impose that sentence.

The facts of the present case illustrate that *Miller* is inapplicable to our discretionary sentencing scheme. The defendant was sentenced following a hearing, at which the trial court considered the presentence investigation report, arguments by counsel and the testimony of witnesses. The defendant was afforded the opportunity to address the court on his own behalf and he declined, a fact that the majority glosses over. The court heard arguments and considered evidence as to the nature of the crime, the effect on the victims and their families, the defendant's subsequent involvement in a similar shooting within mere weeks after the one in the present case, the defendant's family background and upbringing, particularly his relationship with his parents, his educational background and employment history, his criminal record, his status as the father of a young child and his youth.

The presentence investigation report in particular provided the court with more than enough information about the defendant to allow the court to determine whether a total effective sentence of 100 years imprisonment was an appropriate sentence for this individual defendant. Specifically, the report sets forth the details of the crime and the extent of the defendant's involvement in it: On November 17, 2006, in a vehicle that the

defendant had obtained as a "loan" in exchange for drugs, the defendant and two of his friends were driving in the vicinity of Garden Street, Hartford. As they drove by the home in front of which the victims were standing, two people in the car, including the defendant, opened fire on the victims, killing a sixteen year old who he shot in the head and chest, and seriously wounding two other victims, a thirteen year old and a twenty-one year old.

The report also contains the defendant's criminal record, which reveals that the first time that the defendant was arrested was when he was fifteen years old, for carrying or selling a dangerous weapon, for which he was adjudged a youthful offender.[3] While the defendant was still serving probation on that case, he was convicted of another crime, the substance of which is not specified in the report. Accordingly, he was found to have violated his probation. In 2005, also while still on probation for being adjudged a youthful offender, the defendant was arrested again, for possession of marijuana, for which he received an unconditional discharge. The defendant was arrested again in 2007, in connection with the 2006 drive-by shooting that gave rise to the present case. Finally, on March 6, 2007, the defendant was charged in connection with yet another drive-by shooting, only blocks away from the first shooting. At the time of the defendant's sentencing in the present case on May 5, 2009, the charges in connection with the second drive-by shooting were pending.

Because the defendant failed to provide any contact information for his immediate family, the family background information in the report is limited to information that the defendant himself provided, but that information is highly relevant. The defendant was raised by his mother, under fairly good economic conditions, and he described her in the report as being a loving mother, who provided him with a good home. Although his parents did not live together, the defendant reported that his father had been involved in his life when he was growing up, that he visited his father frequently, and that he had a good relationship with the father's girlfriend, who treated him like a son. The report further states that "[the defendant] reported no incidents of physical, mental or sexual abuse during his formative years. He reported that his home was never the subject of intervention by any social service agencies based on any issues of neglect or violence." The report also details that at the time of sentencing, the defendant had a child who was five years old, whom he fathered at the age of fourteen, and for whom he provided monthly child support in the amount of $50.

According to the report, the defendant had been expelled from Weaver High School in 2004 due to a physical altercation with another student. He subsequently completed the tenth grade at East Hartford High

School, with average to below average grades. After being arrested for the present offense, the defendant stopped attending school, but obtained his high school diploma while incarcerated. As for his employment history, the defendant reported working for a landscaping company in 2005 during the summer, earning approximately $300 per week. Finally, as to substance abuse, the defendant admitted to smoking three to four blunts of marijuana on a daily basis for approximately three years, until he participated in a substance abuse treatment program as required by the court. The defendant denied using any other drugs and denied having a problem with alcohol. On the basis of all of the information in the report and the fact that in the present offense the defendant "displayed violently aggressive, anti-social behavior" and had not expressed any remorse, the probation officer recommended a "lengthy period of incarceration."

At the end of the hearing, the court emphasized the factors that it had relied on in imposing the total effective sentence of 100 years. The three victims were innocent bystanders, whose lives were tragically altered—and for Tray Davis, ended—by the defendant's senseless act of violence. The court likened the defendant, who "decided that it would be okay to drive by on a certain day and shoot many times with a semiautomatic weapon into a large group of teenagers just relaxing in front of a house not bothering anybody," to a terrorist whose actions injected fear into the community. The court specifically remarked on the defendant's family background, noting that he had a loving mother and a relationship with his father. He "had all the opportunities that everybody else has in this world, especially in our country, to do whatever he wanted to do and become whatever he wanted to become. And he chose to become a murderer." The court acknowledged that it did not have a sense of the defendant as a person because the defendant did not testify, either at trial or at the sentencing hearing, but the court also stated that it had considered the defendant's future dangerousness in determining the appropriate sentence, and that it had determined that it would never be safe to release the defendant into society again. These remarks of the trial judge indicate that the court viewed the defendant as being " 'the rare juvenile offender whose crime reflects irreparable corruption.' " *Miller* v. *Alabama*, supra, 132 S. Ct. 2469. The court can hardly be faulted for arriving at such a conclusion, when confronted with a defendant who opened fire on innocents because he mistakenly "believed" that they had been involved in a previous attack on his gang, then opened fire on a *different* group of people within two months after the first shooting. It is hardly surprising that the court concluded that it had before it not the usual juvenile murderer, but, in the court's own words, someone who "should be treated like a terrorist."

It is also appropriate for the trial court to craft the sentence in a manner that recognizes the damage done to each of the three victims of the defendant's senseless and violent attack, sentencing the defendant to sixty years for the murder of Davis, and twenty years each for the attempted murders of the remaining two victims, all three sentences to run consecutively. The multiple victims justifies the longer sentence, as it properly reflects punishment for each of the victims, and does not allow the defendant to benefit from the fact that he shot at three people in the same vicious attack. Accordingly, although the sentence is a substantial one, it is not disproportionate to the defendant's crimes. On the contrary, the sentence both reflects the totality of the defendant's wrongdoing while according value to each victim individually.

I emphasize that it is significant that the primary reason that the trial court had little information about the defendant's maturity or lack thereof was because the defendant chose not to present that evidence at the sentencing hearing. He was free to present any evidence he wished to at the hearing—in perfect accordance with the requirements of *Miller*. Moreover, as I have explained, the trial court clearly exercised its discretion in sentencing the defendant. Accordingly, *Miller* does not apply, and the court's decision is entitled to the deference we traditionally accord to sentencing determinations, employing "every reasonable presumption . . . in favor of the correctness of the court's ruling." (Internal quotation marks omitted.) *State* v. *Dupas*, 291 Conn. 778, 783, 970 A.2d 102 (2009). The majority fails to accord the trial court's sentencing determination the appropriate deference, and instead improperly expands *Miller*, despite the Supreme Court's clear statements in that decision that its holding was limited to mandatory sentencing schemes. Moreover, the rule announced by the majority today, requiring the trial court to utter "magic words" acknowledging on the record that the sentencing court has done what the law already requires, is not only unnecessarily paternalistic and not required by *Miller*, but also pointless. I would decline to require trial judges to expressly state that they are performing their duty as the law requires. Instead, I would trust them to exercise their broad sentencing discretion in accordance with the law.

Accordingly, I respectfully dissent.

[1] The defendant received an effective sentence of 100 years of incarceration, which the state inexplicably has conceded is "tantamount to life in prison without the possibility of parole." *State* v. *Riley*, 140 Conn. App. 1, 3 n.2, 58 A.3d 304 (2013). Although I confine my discussion in this dissent to the majority's incorrect application of *Miller* v. *Alabama*,     U.S.    , 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), to our discretionary sentencing scheme, I emphasize that I do not agree with the majority's characterization of the defendant's sentence as the "functional equivalent" of a sentence of life without the possibility of parole for purposes of *Miller*. *Miller* applies only to sentences of life without the possibility of parole, and does not apply at all to sentences for a term of years.

For the delineation of the various sentences comprising the defendant's

total effective sentence, see footnote 2 of the majority opinion.

[2] I am unaware of any case wherein the United States Supreme Court has treated a sentence for a term of years as the "functional equivalent" of a sentence of life without the possibility of parole, and I note that that phrase has been introduced only by the lower courts purporting to apply *Graham* and *Miller*.

[3] The defendant was born on June 8, 1989. He was fifteen years old when he was arrested on November 8, 2004, for carrying or selling a dangerous weapon and when he was sentenced on March 15, 2005. The report does not explain why the defendant was adjudged a youthful offender when he was fifteen years old.

---