******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ACKEEM RILEY
(SC 19109)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued September 16, 2014—officially released March 10, 2015*

*Adele V. Patterson*, senior assistant public defender, for the appellant (defendant).

*Melissa Patterson*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *John F. Fahey*, senior assistant state's attorney, and *Kathryn W. Bare*, assistant state's attorney, for the appellee (state).

*William M. Bloss* and *Sean K. McElligott* filed a brief for the Connecticut Juvenile Justice Alliance et al. as amici curiae.

*Opinion*

McDONALD, J. In a recent trilogy of cases, the United States Supreme Court fundamentally altered the legal landscape for the sentencing of juvenile offenders[1] to comport with the ban on cruel and unusual punishment under the eighth amendment to the federal constitution. The court first barred capital punishment for all juvenile offenders; *Roper* v. *Simmons*, 543 U.S. 551, 575, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); and then barred life imprisonment without the possibility of parole for juvenile nonhomicide offenders. *Graham* v. *Florida*, 560 U.S. 48, 79–80, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Most recently, in *Miller* v. *Alabama*,     U.S.    , 132 S. Ct. 2455, 2460, 183 L. Ed. 2d 407 (2012), the court held that mandatory sentencing schemes that impose a term of life imprisonment without parole on juvenile homicide offenders, thus precluding consideration of the offender's youth as mitigating against such a severe punishment, violate the principle of proportionate punishment under the eighth amendment.

*Miller* did not specifically address the constitutional parameters of when a life sentence without parole may be imposed in the exercise of the sentencing authority's discretion on a juvenile homicide offender. The present case requires us to consider this question.

The defendant, Ackeem Riley, was seventeen years old when he committed homicide and nonhomicide offenses for which the trial court imposed, in the exercise of its discretion, a total effective sentence of 100 years imprisonment. The defendant has no possibility of parole before his natural life expires. In his certified appeal to this court, the defendant claims that his sentence and the procedures under which it was imposed violate *Graham* and *Miller*, and, hence, the eighth amendment. Specifically, the defendant contends that: (1) *Miller* required the trial court to consider his youth and circumstances attendant to his youth as mitigating against the functional equivalent to a life sentence without parole when exercising its sentencing discretion; and (2) if the trial court imposes the functional equivalent to a life sentence in the exercise of its discretion, *Graham* requires that he be afforded a subsequent opportunity to obtain release based on his demonstrated maturity and rehabilitation.

We agree with the defendant's *Miller* claim. Therefore, he is entitled to a new sentencing proceeding at which the court must consider as mitigation the defendant's age at the time he committed the offenses and the hallmarks of adolescence that *Miller* deemed constitutionally significant when a juvenile offender is subject to a potential life sentence. We decline, however, to address the defendant's *Graham* claim. As we explain later in this opinion, the legislature has received a sentencing commission's recommendations for reforms to

our juvenile sentencing scheme to respond to the dictates of *Graham* and *Miller*. Therefore, in deference to the legislature's authority over such matters and in light of the uncertainty of the defendant's sentence upon due consideration of the *Miller* factors, we conclude that it is premature to determine whether it would violate the eighth amendment to preclude any possibility of release when a juvenile offender receives a life sentence.

We begin with a brief overview of the facts that the jury reasonably could have found and the procedural history of this case. In November, 2006, when the defendant was seventeen years old, he participated in a drive-by shooting into a crowd that left an innocent sixteen year old dead and two other innocent bystanders, ages thirteen and twenty-one, seriously injured. The defendant and his accomplice thought that someone responsible for a gang related shooting the previous week was at the scene. The defendant's identity as one of the perpetrators was corroborated by his involvement in an incident two months after the crimes at issue in which a firearm was discharged that matched the weapon used in the 2006 shootings. A jury convicted the defendant of one count of murder in violation of General Statutes §§ 53a-54a (a) and 53a-8, two counts of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a (a), two counts of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8, and one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a). The murder conviction exposed the defendant to a potential sentence of twenty-five to sixty years imprisonment, with no possibility of parole. See General Statutes §§ 53a-35a (2), 53a-35b and 54-125a (b) (1) (E). The other convictions exposed him to sentences ranging from one year imprisonment to twenty years imprisonment.

The trial court ultimately imposed a total effective sentence of 100 years imprisonment. It is undisputed that this sentence is the functional equivalent to life without the possibility of parole.[2] See *State* v. *Riley*, 140 Conn. App. 1, 3 n.2, 58 A.3d 304 (2013). In stating its basis for imposing this sentence, the trial court made no reference to the defendant's age at the time he committed the offenses. After the trial court rendered judgment in the present case in 2009, the United States Supreme Court issued its decision in *Miller*.

In his appeal to the Appellate Court, the defendant contended that his sentence and the procedure under which it was imposed violated his rights under the eighth and fourteenth amendments to the federal constitution. Id., 4, 10 and n.7. A majority of the Appellate Court rejected these contentions. Id., 4. The majority concluded that *Miller* requires only that a defendant be afforded the opportunity to present mitigating evidence,

including evidence relating to his age, and that the court be permitted to impose a lesser sentence than life without parole after considering any such evidence. Id., 10, 14–16. It determined that Connecticut's sentencing scheme comported with these requirements. Id., 18. The majority further concluded that the trial court in the present case had in fact considered many of the factors identified as relevant in *Miller* before imposing the defendant's sentence. Id., 19–21. In his dissenting opinion, Judge Borden disagreed with each of these determinations and concluded that the defendant was entitled to a new sentencing proceeding. Id., 23–40. Judge Borden further opined that, if a trial court determines that a life sentence is appropriate after giving due weight to the offender's youth, *Graham* requires the court to provide for a "second look," i.e., a meaningful opportunity for the juvenile offender to obtain release based on demonstrated maturity and rehabilitation. Id., 39–40.

In his certified appeal to this court, the defendant contends that the Appellate Court majority was incorrect as a matter of law and fact. Specifically, he contends that the sentencing procedure and the sentence itself failed to conform to the dictates of *Miller* and *Graham*. For the reasons that follow, we agree that the defendant is entitled to a new sentencing proceeding that follows the dictates of *Miller*.

I

THE UNITED STATES SUPREME COURT'S TRILOGY

The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." This provision is applicable to the states through the fourteenth amendment. See *Furman* v. *Georgia*, 408 U.S. 238, 239, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). "[T]he [e]ighth [a]mendment guarantees individuals the right not to be subjected to excessive sanctions. The right flows from the basic precept of justice that punishment for crime should be graduated and proportioned to [the] offense." (Internal quotation marks omitted.) *Roper* v. *Simmons*, supra, 543 U.S. 560.

Although the unique aspects of adolescence had long been recognized in the Supreme Court's jurisprudence,[3] it was not until the trilogy of *Roper, Graham,* and *Miller* that the court held that youth and its attendant characteristics have constitutional significance for purposes of assessing proportionate punishment under the eighth amendment. Cf. *Stanford* v. *Kentucky*, 492 U.S. 361, 382–405, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989) (Brennan, J., dissenting) (criticizing majority's failure to consider principle of proportionate punishment in determining that death penalty may be applied to persons who committed capital crime between ages of sixteen and eighteen), overruled in part by *Roper* v.

*Simmons*, 543 U.S. 551, 574, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). Because *Roper* and *Graham* lay the foundation for *Miller*, we begin with a brief overview of those cases.

A

*Roper*

Christopher Simmons was seventeen years old when he planned and carried out the brutal murder of a stranger. *Roper* v. *Simmons*, supra, 543 U.S. 556–57. The state of Missouri challenged the Missouri Supreme Court's decision setting aside Simmons' sentence of death and resentencing him to life imprisonment without eligibility for parole due to his age when he committed the offense. Id., 559–60. The United States Supreme Court agreed with the state court that the execution of a person who was between the ages of sixteen and eighteen when he committed a capital crime constituted disproportionate punishment in violation of the eighth amendment.[4] Id., 555, 568; see *Thompson* v. *Oklahoma*, 487 U.S. 815, 838, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988) (plurality) (concluding that execution of person who was under age of sixteen at time offense was committed violates eighth and fourteenth amendments).

In reaching its conclusion, the court relied upon its prior case law recognizing the unique characteristics of juveniles and scientific evidence regarding differences between adult and juvenile psychological development that explained these characteristics. *Roper* v. *Simmons*, supra, 543 U.S. 569–71. This evidence demonstrated that a juvenile's less developed character, maturity and impulse control affect decision making and appreciation of risk, and that a juvenile's poor decisions did not necessarily portend how the offender might act upon achieving maturation. Id., 569–70. Because of a juvenile's diminished culpability, the court concluded that the two penological justifications for the death penalty, retribution and deterrence, applied with lesser force to them than to adults. Id., 571. The court suggested that, "[t]o the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person." Id., 572.

The court ultimately determined that a categorical ban on executing juvenile offenders was required. Id., 573. It reasoned that "[a]n unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death." Id. In response to an argument that a rare case might exist wherein the juvenile demonstrated sufficient maturity and depravity to warrant a

death sentence, the court pointed out that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Id. Accordingly, the court held that "[w]hen a juvenile offender commits a heinous crime, the [s]tate can exact forfeiture of some of the most basic liberties, but the [s]tate cannot extinguish his life and his potential to attain a mature understanding of his own humanity." (Internal quotation marks omitted.) Id., 573–74.

B

*Graham*

Five years later, the court considered whether a sentence of life imprisonment without parole is disproportionate punishment for a juvenile offender who committed a nonhomicide crime. *Graham* v. *Florida*, supra, 560 U.S. 52–53, 59. Terrance Jamar Graham was seventeen years old when he violated his probation on charges including armed burglary by committing other crimes six months later. Id., 53–55. Reasoning that the defendant had an escalating pattern of criminal conduct, the trial court imposed the maximum sentence permitted by law—life imprisonment. Id., 57. Parole was unavailable under state law. Id. The First District Court of Appeal of Florida concluded that Graham's sentence was not grossly disproportionate to his crimes. Id., 58. The United States Supreme Court categorically rejected that conclusion. Id., 67–75.

The court's reasoning in *Graham* largely expanded upon the analytic blueprint of *Roper*. *Graham* relied on further developments in psychology and brain science that supported the foundational determination in *Roper* regarding the lesser culpability of juvenile offenders. Id., 68. *Graham* analogized the severity of a sentence of life without the possibility of parole for a juvenile offender to capital punishment: "[F]or a juvenile defendant, this sentence means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." (Internal quotation marks omitted.) Id., 70. The court reasoned that a life sentence without parole, the most severe punishment permitted by law for a juvenile offender, was particularly disproportionate in light of prior cases "recogniz[ing] that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishments than are murderers." Id., 69. Thus, the juvenile nonhomicide offender has a "twice diminished moral culpability" when compared to an adult murderer. Id.

In addition to the legitimate penological goals of retribution and deterrence that *Roper* had found lacking in

applying the death penalty to juvenile offenders, the court found that other legitimate goals for punishment—rehabilitation and incapacitation—also were rendered largely ineffective due to the unique characteristics of juvenile offenders. Id., 71–74. Like *Roper*, *Graham* questioned the sentencer's ability to predict whether a juvenile would be a risk to society for the rest of his life in light of his greater capacity for change than an adult offender. The court noted that, "[e]ven if the [s]tate's judgment that Graham was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate because that judgment was made at the outset. A life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity." Id., 73.

In light of these considerations, the court held: "A [s]tate is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the [s]tate must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. . . . The [e]ighth [a]mendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid [s]tates from making the judgment at the outset that those offenders never will be fit to reenter society." Id., 75.

### C

### *Miller*

*Roper* and *Graham* followed a strand of the court's proportionality jurisprudence under which the court adopted categorical bans on sentencing practices for particular groups of offenders "based on mismatches between the culpability of [that] class of offenders and the severity of a penalty." *Miller* v. *Alabama*, supra, 132 S. Ct. 2463. Another strand of proportionality jurisprudence, applied in death penalty cases, required individualized sentencing procedures wherein the mitigating characteristics of a defendant and the details of the offense must be considered. See, e.g., *Eddings* v. *Oklahoma*, 455 U.S. 104, 115, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (evidence of violent family background and emotional disturbance is "particularly relevant" mitigating circumstance that must be considered before imposing death penalty on sixteen year old). In light of *Graham*'s analogy between life without parole and the death penalty, the court in *Miller* concluded that both strands of jurisprudence were implicated in eighth amendment challenges by two offenders who were fourteen years old when they committed murder, an offense for which state law mandated life without parole. *Miller* v. *Alabama*, supra, 2460, 2464. The court concluded that such a scheme violates the eighth amendment because it "prevents those meting out punishment from

considering a juvenile's 'lessened culpability' and greater 'capacity for change,' *Graham* v. *Florida*, [supra, 560 U.S. 48], and runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties." *Miller* v. *Alabama*, supra, 2460.

The court explained that "*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. . . . Those cases relied on three significant gaps between juveniles and adults. First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. . . . Second, children are more vulnerable . . . to negative influences and outside pressures, including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. . . . And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity]." (Citations omitted; internal quotation marks omitted.) Id., 2464.

The court emphasized that these two decisions rested not only on common sense, but also on science and social science: "In *Roper*, we cited studies showing that [o]nly a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. . . . And in *Graham*, we noted that developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control. . . . We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 2464–65. *Miller* further underscored the connection between these findings and the diminished penological justifications for imposing the harshest sentences on juvenile offenders "even when they commit terrible crimes." Id., 2465.

Despite the distinction the court in *Graham* drew between homicide and nonhomicide offenders, the court in *Miller* determined that the reasoning of *Graham* applied with equal force to any juvenile life sentence without parole: "[N]one of what [*Graham*] said about children . . . is crime-specific. . . . *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses. Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without

the possibility of parole. . . . An offender's age, we made clear in *Graham*, is relevant to the [e]ighth [a]mendment, and so criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." (Citation omitted; internal quotation marks omitted.) Id., 2465–66.

A mandatory sentence of life without parole for a juvenile offender, however, contravenes this reasoning insofar as it "precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. . . . And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (Citations omitted.) Id., 2468.

Perhaps most significantly for our purposes, the court in *Miller* summarized its holding as follows: "[T]he [e]ighth [a]mendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. . . . By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider [the petitioners'] alternative argument that the [e]ighth [a]mendment requires a categorical bar on life without parole for juveniles, or at least for those [fourteen] and younger. But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. . . . Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (Citations omitted; internal quotation marks omitted.) Id., 2469.

## II

## IMPORT OF *MILLER* FOR DISCRETIONARY SENTENCING SCHEMES

The parties dispute whether *Miller* extends beyond mandatory sentencing schemes. The state reads *Miller* narrowly in light of its emphasis on the defects inherent in a mandatory scheme. The defendant reads *Miller* broadly in light of its rationale. We conclude that the state's view of *Miller* is unduly restrictive. We read the import of *Miller* as impacting two aspects of sentencing: (1) that a lesser sentence than life without parole must be available for a juvenile offender; and (2) that the sentencer must consider age related evidence as mitigation when deciding whether to irrevocably sentence juvenile offenders to a lifetime in prison. Accordingly, for the reasons set forth subsequently in this opinion, we hold that the dictates set forth in *Miller* may be violated even when the sentencing authority has discretion to impose a lesser sentence than life without parole if it fails to give due weight to evidence that *Miller* deemed constitutionally significant before determining that such a severe punishment is appropriate.

We begin by acknowledging that *Miller* is replete with references to "mandatory" life without parole and like terms. Nonetheless, the Supreme Court's incremental approach to assessing the proportionality of juvenile punishment counsels against viewing these cases through an unduly myopic lens. *Roper* contained language indicating that life imprisonment without parole would be a constitutionally permissible punishment for a juvenile offender when striking down the juvenile death penalty. See *Roper* v. *Simmons*, supra, 543 U.S. 572; see also *State* v. *Allen*, 289 Conn. 550, 581–82, 958 A.2d 1214 (2008) (agreeing with authority from other jurisdictions concluding that life sentence without parole for juvenile offender is permissible under *Roper*). Yet, the court in *Graham* relied on the reasoning in *Roper* to conclude that imposing such a punishment on juvenile nonhomicide offenders violates eighth amendment proportionality principles. See *Graham* v. *Florida*, supra, 560 U.S. 68, 71–73. Similarly, *Graham* contained language distinguishing between nonhomicide and homicide offenses when striking down life sentences without parole for nonhomicide offenders. See id., 69. Yet, the court in *Miller* underscored that nothing *Graham* had noted about juvenile characteristics was crime specific when the court extended the reasoning of *Graham* to preclude mandatory life sentences without parole. *Miller* v. *Alabama*, supra, 132 S. Ct. 2465. Indeed, while carefully limiting its holding to mandatory sentences, *Miller* expressly reserved judgment on whether all juvenile life sentences without parole would run afoul of the eighth amendment. Id. Accordingly, the court's approach in this arena counsels us to examine the logical implications of its reasoning

in these decisions.

Three aspects of *Miller*, when read in light of *Roper* and *Graham*, demonstrate that the decision logically reaches beyond its core holding. First, *Roper*, *Graham* and *Miller* emphasized their reliance on an ever growing body of authoritative evidence establishing constitutionally significant differences between adult and juvenile brains. See id., 2464–65 n.5 ("[t]he evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger"). In reliance on this evidence, the court in *Miller* explained that "[m]ost fundamentally, *Graham insists* that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." (Emphasis added.) Id., 2465. Consistent with that dictate, the court in *Miller* held that it would "*require* [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (Emphasis added.) Id., 2469. This mandate logically would extend to a discretionary sentencing scheme.

Second, in *Miller*, the court expressed its confidence that, once the sentencing authority considers the mitigating factors of the offender's youth and its attendant circumstances, "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." Id. This language suggests that the mitigating factors of youth establish, in effect, a presumption against imposing a life sentence without parole on a juvenile offender that must be overcome by evidence of unusual circumstances. This presumption logically would extend to discretionary schemes that authorize such a sentence.

Third, *Miller* and *Graham* analogized the harshness of a life sentence without parole for a juvenile to the death penalty. See id., 2466; *Graham* v. *Florida*, supra, 560 U.S. 69–71. This penalty is no less harsh if imposed pursuant to an exercise of discretion.

We also find instructive the approach of other jurisdictions to the question of what *Miller* demands. Although there is a split of authority among courts that have considered whether *Miller* applies to discretionary sentencing schemes,[5] we find most telling the response of those jurisdictions whose mandatory sentencing schemes were rendered unconstitutional by *Miller*. Many of these jurisdictions have reformed their sentencing procedures to *require* the sentencing court to consider those youth related factors that *Miller* identified as constitutionally relevant mitigation. See, e.g., Mich. Comp. Laws § 769.25 (6) (2014) ("If the prosecuting attorney files a motion [seeking a sentence of life imprisonment without parole], the court shall conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court shall consider the

factors listed in *Miller* [v.] *Alabama*, [supra, 132 S. Ct. 2455], and may consider any other criteria relevant to its decision, including the individual's record while incarcerated."); Neb. Rev. Stat. § 28-105.02 (2) (Supp. 2013) (requiring court to consider juvenile offender's age and numerous other youth related factors); Wash. Rev. Code § 10.95.030 (3) (b) (2014) ("[i]n setting a minimum term, the court must take into account mitigating factors that account for the diminished culpability of youth as provided in *Miller* v. *Alabama*, [supra, 2455] including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated"); W. Va. Code Ann. § 61-11-23 (c) (LexisNexis 2014) (requiring court to consider juvenile offender's age and numerous other youth related factors); but see, e.g., *State* v. *Ali*, 855 N.W.2d 235, 257 (Minn. 2014) (sentencer must hold evidentiary hearing to consider *Miller* mitigation factors "upon request and with the assistance of counsel"). In addition, several jurisdictions have required the sentencing court to state on the record the basis for a conclusion that life imprisonment without parole is an appropriate sentence, despite mitigating factors relating to the offender's youth. See, e.g., Mich. Comp. Laws § 769.25 (7) (2014); N.C. Gen. Stat. Ann. § 15A-1340.19C (a) (LexisNexis 2013); 18 Pa. Cons. Stat. Ann. § 1102.1 (d) (7) (West Cum. Supp. 2014); see also *Sen* v. *State*, 301 P.3d 106, 127 (Wyo. 2013) ("in exercising its discretion with regard to a determination as to parole eligibility, the district court must set forth specific findings supporting a distinction between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption' ").

For the foregoing reasons, we conclude that *Miller* does not stand solely for the proposition that the eighth amendment demands that the sentencer have discretion to impose a lesser punishment than life without parole on a juvenile homicide offender. Rather, *Miller* logically indicates that, if a sentencing scheme permits the imposition of that punishment on a juvenile homicide offender, the trial court *must* consider the offender's "chronological age and its hallmark features" as mitigating against such a severe sentence. *Miller* v. *Alabama*, supra, 132 S. Ct. 2468. As the court in *Miller* explained, those features include: "immaturity, impetuosity, and failure to appreciate risks and consequences"; the offender's "family and home environment" and the offender's inability to extricate himself from that environment; "the circumstances of the homicide offense, including the extent of [the offender's] participation in the conduct and the way familial and peer pressures may have affected him"; the offender's "inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attor-

neys"; and "the possibility of rehabilitation . . . ."[6] Id.

We note that, following the decision in *Miller*, our state's presentence report has incorporated these factors as required subjects of investigation and reporting. See State of Connecticut, Judicial Branch, Court Support Services Division, "Policies and Procedures," Policy 4.31, effective August 15, 2013, pp. 11, 14–22. In addition to these factors specific to the individual juvenile offender, the report must "note any scientific and psychological evidence showing the differences between a child's (a person under the age of [eighteen]) brain development and an adult's brain development . . . ." Id., p. 22. Although it appears from the report form that the Court Support Services Division intends to provide courts with information on this subject at some point in the future, in the interim, we direct our trial courts to the evidence that *Roper*, *Graham*, and *Miller* credited as authoritative on this subject. To conform to *Miller*'s mandate and our rules of practice; see Practice Book § 43-10; the record must reflect that the trial court has considered and given due mitigating weight to these factors in determining a proportionate punishment.

### III

### APPLICATION OF *MILLER* TO THE PRESENT CASE

By statute and the rules of practice, our trial courts must consider the information in the presentence report before imposing sentence. See General Statutes § 54-91a (a); Practice Book §§ 43-3 and 43-10. In 2009, when the court imposed sentence in the present case, the presentence report did not require information specific to juvenile offenders. The report generically required information regarding, inter alia, "the circumstances of the offense . . . and the criminal record, social history and present condition of the defendant." General Statutes § 54-91a (c). The court was required at that time, and still is today, to hear from all parties and to state on the record the reasons for the sentence imposed. Practice Book § 43-10 (6). Accordingly, nothing in our sentencing scheme specifically required the trial court in the present case to consider, let alone give mitigating weight to, the defendant's age at the time of the offense or the hallmarks of youth.

Nor does the record in the present case reflect, as the state contends, that the trial court adequately considered the factors identified in *Miller*. In the entire sentencing proceeding, only defense counsel made an oblique reference to age. Defense counsel commented, "[y]ou can see that, obviously, [the defendant is] a young man"—a remark that appears to refer to the defendant's age at the time of sentencing—and asked the court to consider the defendant's age. The defendant was then almost twenty years old. Although the undated presentence report reflected the defendant's date of birth and

age (nineteen) at the time the report was prepared, it did not address the defendant's immaturity, impetuosity, and failure to appreciate risks and consequences. Nor did it address the science that establishes such factors as generally applicable.

The main thrust of the court's comments at sentencing related to the innocence of the victims and the choice made by the defendant to commit these senseless crimes. Before imposing a sentence under which the defendant would undoubtedly die in prison, the court characterized the presentence report as reflecting a life that was "pretty unremarkable." The court made no mention of facts in the presentence report that might reflect immaturity, impetuosity, and failure to appreciate risks and consequences. For example, there was no mention of the fact that the defendant was reported to have a five year old child, which meant that he had fathered the child at or before the age of fourteen. Instead, the court noted: "I have very little sense of the type of person [the defendant] is except for what he did on this day and for that that's what I have to sentence him for." Accordingly, the record does not clearly reflect that the court considered and gave mitigating weight to the defendant's youth and its hallmark features when considering whether to impose the functional equivalent to life imprisonment without parole.

Therefore, the defendant is entitled to a new sentencing proceeding that conforms to the dictates of *Miller*. Both the defendant and the state are free to present additional evidence at this new proceeding.

IV

## WHETHER THE DEFENDANT'S SENTENCE VIOLATED *GRAHAM*

As we previously explained, *Graham* precludes the sentencer from determining at the outset that a juvenile nonhomicide offender is beyond rehabilitation, thus requiring that such offenders be afforded a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation if sentenced to life imprisonment. *Graham* v. *Florida*, supra, 560 U.S. 75. The court left it to the states "to explore the means and mechanisms for compliance"; id.; with this so-called "second look" opportunity. *State* v. *Riley*, supra, 140 Conn. App. 22 (*Borden, J.*, dissenting); *State* v. *Null*, 836 N.W.2d 41, 67–68 (Iowa 2013). Although *Graham* was limited to nonhomicide offenses, the defendant in the present case relied on the fact that *Miller* underscored that *Graham*'s rationale was not crime specific; see *Miller* v. *Alabama*, supra, 132 S. Ct. 2465; as support for the view that this second look opportunity extends to juvenile homicide offenders. Two considerations persuade us that it would be inappropriate for us to resolve this question at this juncture.

This court has recognized that "the fixing of prison

terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not courts." (Internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 63, 826 A.2d 1126 (2003); accord *State* v. *Heinemann*, 282 Conn. 281, 311, 920 A.2d 278 (2007) ("[w]e defer to the broad authority that legislatures possess in determining the types and limits of punishment for crimes"); *State* v. *Darden*, 171 Conn. 677, 679–80, 372 A.2d 99 (1976) ("the constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment and to the judiciary the power to try offenses under these laws and impose punishment within the limits and according to the methods therein provided"). Staying our hand in deference to a coordinate branch of government is particularly appropriate in the present case. In the wake of *Miller* and *Graham*, the legislature directed the Connecticut Sentencing Commission (commission) to make recommendations regarding reforms for the sentencing of juvenile offenders. Following the commission's recommendation, comprehensive bills were drafted relating both to the consideration of youth, and its attendant characteristics, as a mitigating factor and to the provision of a second look opportunity upon imposition of sentences in excess of ten years. See Substitute Senate Bill No. 1062, 2013 Sess.; Substitute House Bill No. 6581, 2013 Sess.; Substitute House Bill No. 5221, 2014 Sess. For reasons that are not apparent, in successive years, the bills were tabled in the Senate and were not acted upon before the expiration of the legislative sessions in which they were raised, thus requiring the legislature to take up the issue anew in the next session. In light of our decision in the present case, there is every reason to believe that the legislature will take definitive action regarding these issues with all deliberate speed. Therefore, for now, we will not provide the "means and mechanisms for compliance" with the dictates of *Graham*. See *Graham* v. *Florida*, supra, 560 U.S. 75.

In addition, concerns of ripeness counsel against reaching this issue. The defendant is entitled to a new sentencing proceeding. It is reasonably possible that the trial court will impose a less severe sentence than what is functionally life imprisonment without parole upon due consideration of the defendant's age at the time of the offenses and the hallmark characteristics of youth as they bear on his conduct. Because the defendant's claim rests on the factual predicate of a sentence that is the functional equivalent to life imprisonment without parole, it may be unnecessary for us to decide whether the defendant is entitled to a second look. See *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 86–87, 952 A.2d 1 (2008) ("in determining whether a case is ripe, [the] court must be satisfied that the case before [it] does not present a hypothetical injury or a claim contingent upon some event that has not and indeed

may never transpire" [internal quotation marks omitted]). Indeed, at oral argument before this court, the defendant conceded that we need not reach this claim.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court only with respect to the defendant's sentence and to remand the case to that court for a new sentencing proceeding consistent with this opinion.

In this opinion ROGERS, C. J., and PALMER, EVELEIGH and ROBINSON, Js., concurred.

[1] We use the term juvenile offenders to refer to persons who committed a crime when they were younger than eighteen years of age.

[2] The Penal Code defines "life imprisonment" as a definite sentence of sixty years, unless a sentence of life imprisonment without the possibility of release is imposed, in which case the term means imprisonment for the remainder of the defendant's natural life. See General Statutes § 53a-35b. The defendant was sentenced to sixty years on count one for murder; twenty years on count two for attempt to commit murder, consecutive to the first count; twenty years on count three for attempt to commit murder, consecutive to the first two counts; twenty years on count four for assault with a firearm, concurrent to the second count; twenty years on count five for assault in the first degree with a firearm, concurrent to the third count; and twenty years on count six for conspiracy to commit murder, concurrent to the previous counts.

The defendant contends that the parole statute is ambiguous as to whether he is per se ineligible for parole because of his murder conviction; see General Statutes § 54-125a (b) (1) (E); or whether he is eligible after completing the sentence for that offense and 85 percent of his sentences for the nonhomicide offenses. See General Statutes § 54-125a (b) (2) (B). Even under the interpretation more favorable to him, the defendant would not be eligible for release until he has served ninety-four years imprisonment.

[3] See *Haley* v. *Ohio*, 332 U.S. 596, 599, 68 S. Ct. 302, 92 L. Ed. 224 (1948) (plurality) (instructing courts to take "special care" in considering confession obtained from juvenile due to "great instability which the crisis of adolescence produces"); *Gallegos* v. *Colorado*, 370 U.S. 49, 54, 82 S. Ct. 1209, 8 L. Ed. 2d 325 (1962) (noting that juvenile "cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions"); *Bellotti* v. *Baird*, 443 U.S. 622, 635, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979) ("[T]he [c]ourt has held that the [s]tates validly may limit the freedom of children to choose for themselves in the making of important, affirmative choices with potentially serious consequences. These rulings have been grounded in the recognition that, during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them."); *Eddings* v. *Oklahoma*, 455 U.S. 104, 113–16, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (recognizing that youth is mitigating factor in determining whether to impose sentence of death on juvenile offender).

[4] In *Roper* and *Graham*, the court first determined that there was a national consensus against the punishment at issue as applied to juvenile offenders before examining the proportionality of the punishment. See *Roper* v. *Simmons*, supra, 543 U.S. 567; *Graham* v. *Florida*, supra, 560 U.S. 62–67.

[5] We note that, although some cases simply consider whether *Miller* is violated if the sentencer has discretion to impose a sentence of life without parole, others also consider whether the sentencer was required to consider the offender's youth as a mitigating factor when exercising that discretion. Some courts have concluded that *Miller* only applies to sentences of mandatory life without parole yet have made a point of concluding that the discretionary procedure conformed to *Miller* because the trial court considered the offender's youth. Thus, we conclude that there is no clear consensus on this issue. Compare *State* v. *Agboghidi*, Docket No. 2 CA-CR 2013-0497-PR, 2014 WL 1572742 (Ariz. App. April 21, 2014) (treating as colorable claim that *Miller* applies to life sentence imposed under exercise of discretion), *People* v. *Gutierrez*, 58 Cal. 4th 1354, 1379, 324 P.3d 245, 171 Cal. Rptr. 3d 421 (2014) ("[u]nder *Miller*, a state may authorize its courts to impose life without parole on a juvenile homicide offender when the penalty is discretionary and when the sentencing court's discretion is properly exer-

cised in accordance with *Miller*”); *Daugherty* v. *State*, 96 So. 3d 1076, 1079 (Fla. App. 2012) (*Miller* applies to discretionary scheme), *Diatchenko* v. *District Attorney*, 466 Mass. 655, 668–71, 1 N.E.3d 270 (2013) (concluding that discretionary scheme allowing imprisonment without parole for juvenile offender violates *state* constitution but relying on reasoning of *Graham* and *Roper* in so concluding), *State* v. *Long*, 138 Ohio St. 3d 478, 484, 487, 8 N.E.3d 890 (2014) (The court initially stated that “Ohio’s sentencing scheme does not fall afoul of *Miller*, because the sentence of life without parole is discretionary” but later stated: “Because the trial court did not separately mention that [the defendant] was a juvenile when he committed the offense, we cannot be sure how the trial court applied this factor. Although *Miller* does not require that specific findings be made on the record, it does mandate that a trial court consider as mitigating the offender’s youth and its attendant characteristics before imposing a sentence of life without parole.” [Emphasis omitted.]), *Aiken* v. *Byars*, Docket No. 2012-213286, 2014 WL 5836918, *3 (S.C. November 12, 2014) (“*Miller* does more than ban mandatory life sentencing schemes for juveniles; it establishes an affirmative requirement that courts fully explore the impact of the defendant’s juvenility on the sentence rendered”), and *Garcia* v. *Bertsch*, No. 1:13-CV-021, 2013 WL 1533533 (D.N.D. April 12, 2013) (dismissing, without prejudice, habeas petition challenging discretionary sentencing scheme, noting that “the reasons given by the controlling opinions in *Graham* and *Miller* for why juveniles should be treated differently from adults in this context arguably could be extended to life sentences for juveniles in homicide cases that foreclose a later opportunity for parole”), with *Foster* v. *State*, 294 Ga. 383, 387, 754 S.E.2d 33 (2014) (*Miller* not violated by sentencing scheme that allows life without parole sentences for juveniles as matter of discretion), *Conley* v. *State*, 972 N.E.2d 864, 876 (Ind. 2012) (concluding that, although sentencing court effectively applied *Miller* factors, *Miller* did not apply to discretionary sentencing schemes like Indiana’s), *State* v. *Ali*, 855 N.W.2d 235, 258 (Minn. 2014) (“[b]ecause the imposition of consecutive [life] sentences was not mandatory, but was discretionary, [the defendant’s] reliance on *Miller* is misplaced”), *Randell* v. *State*, Docket No. 61232, 2013 WL 7158872, *1 n.1 (Nev. December 12, 2013) (“*Miller* only applies in states where a juvenile is convicted of a homicide and the law mandates a sentence of life without the possibility of parole”), *State* v. *James*, Indictment No. A-4153-08T2, 2012 WL 3870349, *13 (N.J. Super. App. Div. September 7, 2012) (“the distinction between the *Miller* mandatory sentences and [the] defendant’s discretionary one renders *Miller* inapposite”), *Arredondo* v. *State*, 406 S.W.3d 300, 306 (Tex. App. 2013) (“*Miller* prevented the mandatory imposition of life without parole for juvenile offenders, but specifically allowed a discretionary sentence of life without parole when the circumstances justify it” [emphasis omitted]), *State* v. *Redman*, Docket No. 13-0225, 2014 WL 1272553, *3 (W. Va. March 28, 2014) (“*Miller* does not bar a discretionary life sentence without parole for a juvenile but only bars a mandatory life sentence without parole”); and *United States* v. *Lewis*, Nos. CRIM. 04-20115-04, 05-20080-01, 2013 WL 5935228, *3 (W.D. La. November 1, 2013) (“holding of *Miller* is limited to juveniles whose offense involved homicide and who received a mandatory life sentence without the possibility of future release”).

[6] We note that these factors are consistent with those proposed by each chamber of our legislature in bills drafted to conform our sentencing law to the dictates of *Miller*. See Substitute House Bill No. 5221, 2014 Sess.; Substitute Senate Bill No. 1062, 2013 Sess.; Substitute House Bill. No. 6581, 2013 Sess.